MARIE S. WALLINE *et al., Appellees,* V. N. T. OLSON *et al., Appellants.*

No. 16,840.

SYLLABUS BY THE COURT.

1. FRAUD—*Notice—Public Records—Limitation of Actions.* In an action for relief on the ground of fraud it is *held,* following *Black v. Black,* 64 Kan. 689, that the records of the probate court involving the transactions complained of were constructive notice of the alleged fraud sufficient to set in motion the two-year statute of limitations.

2. ———— *Fiduciary Relations—Actual Notice of Fraud—Limitation of Actions.* The evidence examined and held not to disclose such fiduciary relations between the parties as to absolve the plaintiffs from examining the records or such a relation of trust and confidence between them as would prevent the statute from beginning to run until after the actual discovery of the alleged fraud.

Appeal from McPherson district court. Opinion filed February 11, 1911. Reversed.

STATEMENT.

THE plaintiffs alleged that Nils Nyberg in his lifetime was the husband of plaintiff Marie S. Walline and the father of plaintiff Axel Nyberg, and that he died in December, 1881, intestate, leaving his widow and child his only heirs at law; that before his death, in May, 1881, he purchased and became the owner in fee simple of a quarter section of land in McPherson

county, for which he agreed to pay $2700, and in payment of which he and his wife executed a first mortgage on the land for $1200, a second mortgage for $120, and a third mortgage for $900; that the $900 mortgage was given to defendants Olson and Akeson to secure them for their liability as sureties on three notes executed by Nyberg and wife, payable to Rogers, from whom the land was purchased; and that Nyberg and wife also signed a note for $600 to Rogers, which was likewise signed by Olson and Akeson as sureties.

The petition alleged that at the time of her husband's death plaintiff Marie S. Walline was very young; that she had lately come to America from Sweden, could not speak, read or write the English language, and had no knowledge of the methods of transacting business, of her rights as widow, or the rights of her minor child, who was an infant a year old; that after her husband's death she continued to live at the home of P. Akeson, and to keep house for him for the maintenance of her child and herself, until December 21, 1882; that Olson and Akeson had befriended Nyberg in his lifetime, and had assisted him in buying the land by becoming his sureties; that he had full confidence in their integrity and friendship, and that shortly before his death he requested them to look after and care for his wife and child and his estate, which they promised to do; that immediately after his death plaintiff Marie confirmed and ratified the arrangement made by her husband and there was thereby created a fiduciary relation between her and Olson and Akeson; that she authorized them to act for her, and directed them to take possession of all the land and personal property and have the same administered upon according to law, and for her best interests, and in order to protect themselves as sureties on the notes.

It was alleged that defendants Olson and Akeson procured the appointment of defendant J. P. Grant as administrator of the estate, and signed his bond as

sureties; that they caused the property of the estate to be appraised, and took actual possession thereof and controlled and managed the same, as agents of the plaintiffs; that they harvested the crop of wheat and disposed of the same with the consent of the administrator, and paid the first Rogers note for $350 and the interest upon the prior mortgages. The petition alleged that Olson and Akeson took advantage of Marie's ignorance of the language and her confidence and trust in them and appropriated the estate to their own use, and that in April, 1882, they procured an order of the probate court for the administrator to sell the land at private sale for the payment of debts, at a time when there were no debts due against the estate, that they had the land appraised at $1800, when it was worth $2700, and the administrator sold the same to Olson and Akeson for a pretended consideration of $531.58, subject to the mortgages; that they then induced the administrator to file an account in which he credited himself with a number of false items which he pretended to have paid upon allowances made by the court, and procured an order confirming the sale, and that he executed to them an administrator's deed, which was afterward placed of record; that in fact no actual consideration was paid by Olson and Akeson, who took possession of the land under the deed and falsely represented to Marie that nothing remained after paying the indebtedness of the estate; that in August, 1884, they sold and conveyed the land to a son of Akeson for $4000.

It was further alleged that defendant Grant, for the purpose of aiding the other defendants in a scheme to convert all the property of the plaintiffs to their own use, neglected and refused to make any other account and settlement of his administration until 1907, when required to do so upon application filed by the plaintiffs in the probate court, at which time the probate court approved his first annual account as a final

account, over their objections, and they appealed therefrom to the district court; that the appeal was still pending at the time this suit was brought; that she had no knowledge of the facts and no means of discovering that the representations were false until the year 1907, and that Axel Nyberg, who was an infant of tender years at the time the deed was made, knew nothing about the closing up of his father's estate, excepting what his mother told him, until the summer of 1907. Inasmuch as the real estate had since passed into the hands of innocent purchasers, the plaintiffs prayed judgment for the $4000, which it was alleged were the proceeds of the sale of the land in August, 1884, less the amounts actually paid by Olson and Akeson as trustees on account of the mortgages, and also for $1000 rents and profits.

There was a second count setting up the same facts and alleging that defendant Grant had been unfaithful to his trust as administrator, and that defendants Olson and Akeson were indebted to the plaintiffs in the sum of $3000 by reason of having been sureties on the administrator's bond.

Separate answers were filed by each of the defendants, consisting, among other defenses, of a general denial, a plea of the statute of limitations, and setting up that on the appeal from the decision of the probate court discharging the administrator and approving his final account the district court had rendered judgment in favor of the administrator, which was an adjudication against the plaintiffs of all matters involved in the account of the administrator. The court dismissed the action as to the administrator. There was a trial, resulting in a verdict by the jury in the plaintiffs' favor in the sum of $4148. Defendants Olson and Akeson appeal.

*G. F. Grattan,* and *J. M. Grattan,* for the appellants.

*Frank L. Martin,* for the appellees.

Walline v. Olson.

The opinion of the court was delivered by

PORTER, J.: There are thirty-three errors assigned, but few of which require comment. It is claimed that the court erred in not requiring certain special questions to be answered more definitely by the jury. All of the questions were so complex and involved that the court might properly have refused to submit them in the first place. The appellants also submitted to the court twenty written requests for instructions upon questions of law and of fact which they claimed were pertinent to the issues, and error is predicated upon the refusal to prepare and give instructions upon these matters. We think the court properly denied the requests, none of which was in the form of a written instruction.

The court, however, erred in not directing judgment in favor of the appellants on the plea of the statute of limitations. There can be no question that the action was not brought within two years from the time the alleged fraud should have been discovered. (*Black v. Black,* 64 Kan. 689; *Lewis v. Duncan,* 66 Kan. 306; *Donaldson v. Jacobitz,* 67 Kan. 244; *Rogers v. Richards,* 67 Kan. 706; *Hutto v. Knowlton,* 82 Kan. 445.)

In *Black v. Black,* supra, a party was charged with unfaithful administration of an estate of a deceased person. It appeared that she had filed her report and account as required by law for the express purpose of affording information to all persons interested, and it was held that these public records gave constructive notice to all parties as to what was done. In *Hutto v. Knowlton,* supra, the foundation of the rule as to constructive notice of fraud by public records sufficient to start the statute of limitations was said to consist in this:

"Where a public record is required by law to be kept as a source of information respecting property rights and interest a duty rests upon anyone to whom the in-

formation is material to improve with diligence the opportunity of learning that which the record discloses. It follows that if the opportunity be neglected the interested person will be bound to the same extent as if he had in fact examined the record. But the rule is no broader than its basis, and if for any reason no obligation exists to consult the record, or if the interested person be circumvented from taking advantage of his opportunity, the rule does not obtain." (82 Kan. 448.)

It is insisted that a fiduciary relation existed between the parties and therefore the statute would not begin to run until after the actual discovery of the alleged fraud; that by reason of the relation of trust and confidence the plaintiffs were not required to examine the records to discover what had been done. The agreement which the plaintiffs relied upon was that the appellants were to manage the property for the plaintiffs' benefit. The jury found in answer to several special questions that the appellants were the agents of the plaintiffs in all that they did in connection with the estate and the sale of the land, but we have not been cited to any witnesses who so testified. If they were agents of the plaintiffs it was because of the circumstances under which they took possession of the property. The plaintiffs offered no evidence in support of the allegation that prior to his death Nils Nyberg requested or obtained a promise from the appellants to take care of his wife and child or to look after his estate. Both appellants denied that any such conversation took place. Nor did plaintiff Marie testify that the appellants agreed to take the property and look after it for the benefit of the plaintiffs. The appellants denied this, and testified that after the death of Marie's husband she told them to take the land and do the best they could with it in order to save themselves.

It appears from the testimony of John P. Grant, the administrator, and H. Helstrom, who was appointed guardian of the minor in the proceedings to sell the real estate, that all the parties that had any-

thing to do with the land were Swedes who spoke the English language brokenly; that the appellants were poor and had mortgages on their own farms, and were apprehensive that they would lose by being sureties of Nyberg; that times were hard, and that land in the same neighborhood of about the same value sold in 1882 and 1883 for less than this brought at the administrator's sale. The testimony convinces us that the land was not appraised for less than it was worth, and that neither of the appellants wanted it or wished to speculate upon it. They took it for the purpose of protecting themselves. They held a third mortgage, and there was nothing in the relations existing between the parties which made it improper for the appellants to purchase at the administrator's sale. They bought the land for $531.58, subject to prior mortgages, and agreed to pay all the debts of the estate, which they did. Much is made of the circumstance that they did not in fact pay some of the notes they took credit for until long afterward, when they sold the place in 1884. It appears that as substitutes for the notes signed by the Nybergs and themselves they gave new notes of their own, which they afterward paid when the land was sold to Akeson's son, or when he had paid for it. It is not suggested how this defrauded anyone or why it may not have been done in the best of faith, except that it is claimed that one of these notes was in fact paid out of proceeds received from the sale of the crops. The appellants are old men, one of them seventy-four, and it is not surprising that they were unable to explain clearly all the transactions after a laspe of so many years. This question of fraud was determined adversely to the plaintiffs when the district court on appeal reached the same conclusion as the probate court and discharged the administrator, after approving his first as a final account.

This appears to be the kind of a case to which the statute of limitations was made to apply. Twenty-five

years before the action was brought the administrator·
filed a full accounting of all his acts, in which he took
credit for the payment through the appellants of three
notes, which were debts of the estate· and upon which
the appellants were sureties. He filed vouchers for·
these claims which it is now insisted were false and
fraudulent. It is true, there had been no final account-
ing, and he was not discharged; but an examination of·
the probate records would have disclosed the allowance
of these claims, and all the proceedings resulting in the·
sale of the land to the appellants. It is not seriously
claimed that plaintiff Marie continued during all these
years in ignorance of the English language and of her
possible rights and claims. It appears from her own
admission that she knew of the sale of the land by the·
appellants when it was made. She went with her·
mother to where Olson was working in the field, told
him that she had heard that he sold the land for $4000,
and asked if he could not pay her part of the $500
which her husband had paid on the $600 note before
his death. Olson told her in reply that they had not
received all the money for the land and he did not
know that there would be anything left after paying·
the debts, but if there was he would pay her $100.
Moreover, the young man who purchased the land from
the appellants in 1884 was married to Marie's sister,
and they continued to own the land until 1893, when
they lost it by foreclosure proceedings. During this·
time she knew that the appellants had nothing more·
to do with the land and that her sister and the latter's
husband claimed to own it.

The son testified, in substance, that when he was
eighteen years old he first learned from his mother that
the land had once belonged to his father, and he took
the deed found among some old papers with the inten-
tion of having inquiries made about their rights ·in the·
land. He waited until he was twenty-seven years of·
age before he brought the action. During all this time·

he lived in McPherson county, and there is no pretense that he continued in ignorance of the English language or that he was under any disability after he arrived at majority which prevented him from making an examination of the records and from discovering all that he claims to have discovered in 1907.

A careful examination of the record fails in our opinion to disclose fraud or bad faith on the part of the appellants. The jury have found otherwise, but the case should not have been submitted to a jury, for the reason that the plaintiffs have slept too long upon their rights to maintain the action.

The judgment is reversed and the cause remanded, with direction to enter judgment for the appellants.