No. 27,751.

Harry J. Bailey et al., *Appellants*, v. William Brown, *Appellee*.

(264 Pac. 35.)

SYLLABUS BY THE COURT.

1. Waters—*Dikes and Drains—Construction by Adjoining Landowners—Right to Remove.* In an action to compel the removal of a dike, there was evidence tending to show an agreement between adjacent landowners to construct a dike and ditch for the purpose of carrying off flood waters; that they were constructed in accordance with such agreement and have been acquiesced in for a long period of years. *Held,* removal of the dike could not be compelled without defendant's consent.

2. Frauds, Statute of — *Real Property — Maintenance and Acquiescence in Dike.* Where parties by mutual agreement construct ditches and dikes between their lands, maintain them for a long period of years and acquiesce therein, the agreement, followed by maintenance and acquiescence, is not obnoxious to the statute of frauds.

Appeal from Atchison district court; William A. Jackson, judge. Opinion filed February 11, 1928. Affirmed.

*J. M. Challis,* of Atchison, for the appellants; *W. P. Waggener, O. P. May* and *B. P. Waggener,* all of Atchison, of counsel.

*Charles J. Conlon,* of Atchison, for the appellee.

The opinion of the court was delivered by

Hopkins, J.: Plaintiff sought by mandatory injunction to compel the defendant to remove a dike or embankment erected on or near the line separating their land, was defeated, and appeals.

Some twenty-five or thirty years ago (the time not being definitely fixed) the owners of the respective tracts of land agreed to construct a drainage ditch and dike between the lands for the purpose of carrying off the flood waters. The plaintiff contends that the arrangement was experimental only; that they agreed to try out the plan and if not successful to abandon it; that an attempted transfer of land in connection therewith was in violation of the statute of frauds, ineffective, and that the arrangement between the parties was not binding and could be revoked. Defendant contends that the arrangement was not experimental, but that the plan was agreed upon and put into execution, and that it has been maintained during all the years; that there was no transfer of lands, but the

Frauds, Statute of, 27 C. J. p. 326 n. 36. Waters, 40 Cyc. p. 762 n. 86.

changing only of the position of a fence for the convenience of the parties; that the plaintiff desired to carry the water from his own land, and that the ditch was dug upon the theory that it would serve such purpose; that the defendant agreed to and accepted the embankment upon his land for the reason that he thought it would tend to save the flow of surface water onto his land; that both parties would thereby be benefited by the drainage of their respective lands; that under these conditions, the small ditch and embankment were jointly constructed and are still in existence.

Plaintiff testified that at the time he said: "We will cut the dike if it does not carry the water. I do not want a frog pond on my farm. I cut the dike shortly after that, and there came a rain and I went down with the shovel. The defendant moved his fence back and never paid any attention to it after that."

On cross-examination he stated that he and the defendant started a system of drainage to drain the low land; that the dike is the full length of the division line between the parties—160 rods; that the ditch three-fourths of a mile long was experimental; that it was made with the township grader; consumed three days in the making; that the dirt was put on defendant's land; plaintiff helped to put it there; that after the first construction, it was afterwards changed and taken straight east to a bayou; that plaintiff had not worked on the ditch except to dig out obstructions; that he had worked on it some to keep it open, and continued to maintain the ditch ever since it has been there.

Plaintiff testified: "Have dug holes in the ditch but have continued to maintain the ditch. When I started to dig this ditch, Pete Cawley and I had a conversation in which it was said if the ditch was not efficient we would make it so, and every year we would do something to get relief. About the time I commenced this suit Brown was repairing the dike." He also testified that he had cleaned the ditch ever since it was constructed. "We would do anything to get rid of the water and tried to keep it open ever since it has been there and whatever and wherever we could."

He also stated that at the time he and Cawley built the ditch he (the plaintiff) also built a dike six or seven inches high on his land and on his side of the ditch to "hold the water off of the farm land and keep it back on the grassland between the two dikes until it would get away;" that just once on one occasion he had torn

Bailey v. Brown.

holes in the Cawley dike. "Just made holes through it with the shovel for the purpose of letting the water go onto the Cawley land—shortly after he and Cawley had done the work." That he continued to maintain the ditch ever since it had been there.

"Q. You and Pete Cawley had a conversation when you started to dig this ditch and put it in, and the result was that you said that if it was not efficient we will make it that way?  A. Yes; exactly."

There was testimony to the effect, also, that the ditch itself at times had been permitted to fill up with cornstalks and rubbish, and that this caused overflowing of plaintiff's land.

Cawley, who owned the defendant's land at the time of the construction of the ditch and dike, testified substantially that he and Bailey made the arrangement in 1896 or 1897 and constructed the ditch along the north line; that nothing was said about it being an experiment or a temporary arrangement. "Mr. Bailey had four horses and I had four horses and we took out slips and worked about 30 rods of the east end to the bayou, and after we had done that they hired Jinks to dig with a spade; and he was six foot tall, and the ditch was deeper than a spade handle over his head when he got through."

"Q. Was there anything said about this being an experiment or a temporary arrangement?  A. No. Not by any means.

"Q. What was done or said about your maintaining this ditch after it was constructed and ready for business?  A. We worked together on it for about three years to the best of my knowledge, and his hired man would, and we took eight horses and cleaned it out and put our slips in when we had idle time and cleaned it out.

"Q. When did you sell the land and move from there?  A. 1910.

"Q. Do you know if this Bailey land overflows or not?  A. Yes; all of them overflow from the river. The whole bottom overflows.

"Q. Was there anything said as a part of your arrangement with Bailey about the right to tear down the dikes and remove them at will by either of you.  A. No.

"Q. How long was it to be there?  A. Indefinitely.

"Q. Was it to be there whether it was a success or not?  A. It was; the idea was a success.

"Q. It was to be there indefinitely?  A. We put in the ditch to stay there.

"Q. For a certain length of time?  A. No; to stay.

"Q. Installed and stay there according to the mutual agreement of both of you?  A. Yes; always."

A question was raised with reference to a division fence moved at the time of constructing the ditch and dike. The fence was set over twenty-five feet from the line on the Cawley land. On rebuttal the plaintiff testified:

"Q. What about the location of the fence? A. The fence was to be set over on him and so we could work the ditch.

"Q. That was understood at the time? A. Yes.

"Q. Was the fence placed there? A. Yes."

After the plaintiff with his spade made some holes in the dike on the Cawley land the fence, was placed back approximately in its original position between the ditch and the dike, leaving the ditch on plaintiff's side of the fence and the dike on the Cawley, or defendant's, land. Cawley testified that the fence was taken down by an overflow of water and that he placed it back in its original position. There was substantial evidence to sustain the general finding that the ditch and the dike were constructed for the mutual benefit of the parties, have been maintained and are still in existence.

The situation here is not unlike that between the owners of adjacent lands who have agreed upon, established and acquiesced in a boundary line covering a period of years. In *Steinhilber v. Holmes,* 68 Kan. 607, 79 Pac. 1019, it was held that:

"Where parties by mutual agreement fix boundary lines and thereafter acquiesce in the lines so agreed upon, they must be considered as the true boundary lines between them even though the period of acquiescence falls short of the time fixed by the statute for gaining title by adverse possession. The owners of adjoining tracts of land may, by parol agreement, settle and permanently establish a boundary line between their lands, which, when followed by possession according to the line so agreed upon, will be binding upon the parties and their grantees. Such an agreement, followed by possession, is not obnoxious to the statute of frauds." (Syl. ¶¶ 1, 2.)

This principle, which we deem applicable in the instant case, has been enunciated numerous times. (See *Parks v. Baker,* 81 Kan. 351, 105 Pac. 439; *Edwards v. Fleming,* 83 Kan. 653, 663, 112 Pac. 836; *Kastner v. Baker,* 92 Kan. 26, 139 Pac. 1189; *Shanks v. Williams,* 93 Kan. 573, 144 Pac. 1007; *Stahl v. Stevenson,* 102 Kan. 844, 845, 171 Pac. 1164; *Dean v. Evans,* 106 Kan. 389, 188 Pac. 436; *Shafer v. Leigh,* 112 Kan. 14, 209 Pac. 830; *McBeth v. White,* 122 Kan. 637, 253 Pac. 212.)

Bailey v. Brown.

The difficulty in the instant case appears to arise from the fact that the bayou to which the ditch conducted the waters has filled to such an extent that it will no longer take care of the drainage. Plaintiff, therefore, seeks to turn the drainage from his place into the direction it previously flowed, that is, in a southeasterly direction over the defendant's land. This, in our opinion, cannot be done without the consent of the defendant because of the mutual arrangement acquiesced in between the owners of the land in question. The statutes provide a method for reclamation of overflowed lands (R. S. 24-601 *et seq.*), and undoubtedly if the plaintiff's and others' lands in this district are seriously affected, measures will be found to relieve them of the overflow.

The plaintiff relies upon *Jones v. Stover*, 131 Ia. 119, 108 N. W. 112, wherein it was held substantially:

"A license to drain water onto the land of another, being without consideration, is revocable at the pleasure of the licensor. A parol license, without consideration, to one to drain his land onto that of the licensor, is a personal privilege to the licensee and does not pass with the land. An agreement allowing one to drain his land onto that of another, even if more than a revocable license, and so creating an easement or interest in land, is within the statute of frauds, and so being without consideration and possession of land not having been taken thereunder, it cannot be proved by parol."

This and other similar authorities relied upon by plaintiff are not in our opinion controlling here, for the reason that the arrangement between the parties owning the lands in question was agreed upon and acquiesced in for a long period of years. The general finding of the trial court in favor of the defendant embraced all the essentials necessary to uphold the court's conclusion.

The judgment is affirmed.