No. 36,226

Marion S. Wagner, *Appellee*, v. D. F. Thompson et al., *Appellants*.

(186 P. 2d 278)

Lloyde Morris, judge. Opinion filed November 8, 1947.

*Gerald Kolterman,* of Manhattan, and *Arthur S. Humphrey,* of Junction City, argued the cause, and *Charles S. Arthur,* of Manhattan, and *James V. Humphrey,* of Junction City, were with them on the briefs for the appellants.

*Hal E. Harlan,* of Manhattan, argued the cause, and *A. M. Johnston,* of Manhattan, was with him on the briefs for the appellee.

The opinion of the court was delivered by

Hoch, J.: This is a boundary line dispute involving title to about 5.42 acres of farm land in Pottawatomie county. Plaintiff, who was in possession, prevailed in an action to quiet title and the defendants appeal. The case was tried on December 29, 1941, and taken under advisement until April 4, 1944, when the trial court made twenty findings of fact favorable to plaintiff and entered judgment accordingly. The defendants moved to set aside findings from ten to twenty—to which further reference will be made—on the ground that they were not supported by evidence, and to substitute other

findings. They also filed a motion for a new trial. Both motions being overruled, notice of appeal was filed in the district court on May 31, 1944, but the appeal was not filed in this court until May 28, 1947, the delay being occasioned—in part at least—by the deaths of the attorneys on both sides who had tried the case.

It would not help in presenting the issue here to recite fully the averments of the pleadings or of those findings of fact which are not in controversy. Appellants' land, which lies south of the west portion of appellee's land, comprises about 62.73 acres according to the record description, and appellee's land comprises about 162 acres. Both tracts are irregular in shape and their description by metes and bounds is not here necessary. No question of title to either tract is involved except as to the small tract in dispute. In order to make the record complete, the description of this disputed tract, as given in the findings and judgment of the trial court, will later be incorporated herein.

In the findings of fact, undisputed title to appellee's land is traced back to one A. H. Goodman, who became the owner in February, 1881. Title to appellants' land is traced back to a conveyance to Edwin Dean and J. W. Dean in November, 1880.

In the interest of brevity, we shall summarize the trial court's findings of fact numbered 10 to 19, inclusive, and set out in full only finding number twenty. The trial court found:

The Deans, appellants' predecessors in title, erected a fence on what they assumed was the division line between their land and the land owned by Goodman, appellee's predecessor in title, and were cutting timber on land that Goodman claimed belonged to him. A controversy arose between them as to the true division line between their respective tracts and as a result they agreed to have a survey for the purpose of establishing the "division line." As a result of this controversy and an oral agreement, a survey was made in the spring of 1882 by J. W. Paul, at that time county surveyor of Riley county. The Paul survey established as the eastern terminus of the division line between the respective tracts a point on the bluff, at which point Paul embedded partially in the ground a limestone rock and cut thereon the initials "E. D.," which stone marked with the initials still stands in the same place. In 1882 the parties by oral agreement erected a fence on the division line established by the Paul survey, which fence extended from the marker on the bluff to the western terminus on the bank of the Big Blue river. If a marker

was set at the western terminus, it has been washed out by changes in the course of the river. After the Paul survey in 1882, the Deans and Goodman proceeded to make permanent improvements on their respective tracts by erecting buildings thereon and each party cut the timber on his own side of the' fence and where the land was in cultivation, each cultivated it to the fence claiming ownership of such land. Goodman set out a large orchard and a grape vineyard on his side of the fence. Subsequently, successive owners of the respective tracts up to about the year 1941 made permanent improvements on their side of the fence and cultivated the land up to the line established by the Paul survey. During the period from 1882 to 1941, parts of the fence were washed out from time to time by floods, but the fence was rebuilt at all times on the line established by the Paul survey in 1882. Up to 1922, the only outlet from appellants' land was a road leading north through the land now claimed by appellee and her predecessors in title, and in 1922 the appellants and others petitioned for a road running east from the northeast corner of appellants' property to the highway. Pursuant to the petition, the county commissioners of Pottawatomie county and the county engineer met with the respective landowners at the scene of the proposed road and by agreement of all interested parties, the proposed road was located on lands immediately north of the east part of the fence line established by the Paul survey, and the old road across the northern tract was vacated. The road was located without an actual survey and is still being used as a public highway. In 1940, the appellant Thompson petitioned for a legal survey, giving notice as provided by law. The survey was made by George T. Dean of the engineering department of Kansas State College, and the Dean survey was filed for record. None of the interested landowners appealed from this survey. Under the Dean survey of 1940, the boundary line was found to be north of the line established by the Paul survey of 1882, and between these two lines lies the disputed tract comprising about 5.42 acres, which will later be more specifically described.

In her petition plaintiff alleged that she and 'her predecessors in title had been in adverse possession of the now disputed strip for more than fifty-eight years, and that the Paul survey established the true and correct boundary line. Finding of fact number twenty was as follows:

"The court finds that although there is no direct evidence of an agreement

between the Deans and Goodman that the line established by the Paul survey in 1882 should constitute the boundary line between the two tracts of land, the fact that a surveyor was called and paid by them to establish a division line between them, and following said survey a line fence was erected upon said line which has been maintained at said location for more than fifty-five years, that the timber was cleared on each side of said line fence by Goodman and successors on the north and Deans and successors on the south, that permanent and lasting improvements were made on each tract by the owners thereof, that the land was cultivated and used by each up to the line of the Paul survey, that an orchard and grape vineyard were planted immediately north of said line by Goodman, that both tracts of land have been in the possession of the respective title holders claiming to own and hold the same adversely to each other and to the world, each acquiescing in the ownership of the other during all of such time, constitutes such evidence that the court may and does infer that an agreement was made and entered into between the Deans and Goodman, that the line established by the Paul survey should and would constitute the true boundary line between said tracts of land, and that said agreement is binding upon their successors in title including plaintiff and defendants, and that plaintiff and her predecessors in title have been in the open, notorious, exclusive, continuous, hostile and adverse possession of said disputed land claiming to be the owner thereof for a period of more than fifty-five years."

Upon these findings of fact, the trial court found for the plaintiff and entered judgment quieting her title as against the defendants to the disputed tract described as follows:

"Starting at the East one-fourth corner of section 24, township 9 south, range 7 east of the 6th P. M.; thence north along range line between ranges 7 and 8, a distance of 85.8 feet; thence north 82 degrees east 140.58 feet; thence north 3 degrees 20 minutes west 1412.22 feet to the point of beginning, thence north 100.5 feet, thence south 83 degrees 30 minutes west 1881.0 feet to the east bank of the Blue river, thence 151.0 feet in a southerly direction along the east bank of said river; thence in a northeasterly direction along the present fence line to the point of beginning, containing 5.42 acres more or less."

We come now to the issue. Appellants contend that there was no substantial evidence to support material findings of fact by the trial court, and that facts were not proven sufficient to bring appellee's claim within the Kansas rule with reference to adverse possession. They also contend that appellee is bound by the survey of 1940, and that that survey determines title to the disputed strip.

The latest statement of the Kansas rule of adverse possession on the point here involved is found in *Craig v. Paulk*, 162 Kan. 280, 176 P. 2d 529. Syllabus paragraph 4 reads:

"Ownership of land cannot be established by adverse possession where oc-

cupancy was taken and continued under a mistake as to the true boundary line and *where no clear intention is shown to claim the land to a certain line regardless of whether such line is the correct boundary.*" (Italics supplied.)

This rule was laid down in this state as early at least as the case of *Winn v. Abeles,* 35 Kan. 85, 10 Pac. 443. See, also, *Shanline v. Wiltsie,* 70 Kan. 177, 181, 78 Pac. 436; *Scott v. Williams,* 74 Kan. 448, syl. ¶ 1, 87 Pac. 550, and other cases cited in *Craig v. Paulk,* supra.

Admittedly the Kansas rule is more strict as against one claiming by adverse possession than the rule followed in many other jurisdictions. Quoting from *Craig v. Paulk*:

"It is asserted in 1 Am. Jur. at page 914 that 'the great weight of authority' is to the effect that an open, notorious, and hostile possession of property for the statutory limitation period is sufficient for the acquisition of title by adverse possession, and that the fact that the possession was taken under a mistake as to the boundary lines is immaterial'." (p. 284.)

Further discussion of this divergence of views may be found in *Craig v. Paulk,* supra.

In *Edwards v. Fleming,* 83 Kan. 653, 112 Pac. 836, syllabus paragraph 3 of which states the rule substantially as in *Craig v. Paulk,* it was said in the opinion, citing numerous authorities:

"It is well settled that adjoining landowners may, either by writing or parol, agree upon the boundary between their lands, and that their possession on either side up to the boundary so agreed upon will be mutually adverse." (p. 663.)

It is interesting to note that one of the Kansas cases cited is *Steinhilber v. Holmes,* 68 Kan. 607, 75 Pac. 1019, which was again cited in *Bailey v. Brown,* 125 Kan. 149, 152, 264 Pac. 35, the following quotation being taken from the Steinhilber case:

"Where parties by mutual agreement fix boundary lines and thereafter acquiesce in the lines so agreed upon, they must be considered as the true boundary lines between them even though the period of acquiescence falls short of the time fixed by the statute for gaining title by adverse possession. The owners of adjoining tracts of land may, by parol agreement, settle and permanently establish a boundary line between their lands, which, when followed by possession according to the line so agreed upon, will be binding upon the parties and their grantees. Such an agreement, followed by possession, is not obnoxious to the statute of frauds." (Syl. ¶¶ 1, 2.)

In *Bailey v. Brown,* supra, it is stated that this principle has been enunciated numerous times (see cases cited on page 152). Apparently in some of these cases, the court based its conclusion upon a mutual agreement to fix boundary lines followed thereafter by ac-

quiescence and possession rather than upon a simple claim of adverse possession. In any event, in no Kansas decisions that we have discovered has there been any announced departure from the Kansas rule.

Under the so-called majority rule, there could be no question whatever that plaintiff's evidence established her ownership by adverse possession. There was ample evidence to support the trial court's finding that from the time when the dividing line fence was built following the Paul survey in 1882 up until very recently, the parties on both sides of the fence had farmed up to the fence, and had made permanent improvements, and that there was unbroken acquiescence in the fence line as the division line. Appellee, however, does not ask us to reëxamine the Kansas rule but asserts that the evidence was amply sufficient to sustain her claim to adverse possession even under the stricter Kansas rule. We are, therefore, here concerned only with whether appellants' contention is correct as to the evidence.

Careful examination of the abstract discloses evidence sufficient in our opinion to support the findings of the trial court. None of the parties involved in the agreement for the survey in 1882 being available as witnesses, the plaintiff had to establish her case largely by circumstantial evidence. However, there was one witness, Albert Goodman, who testified from personal knowledge as to some of the facts. He was eight years old when his father, Albert H. Goodman, purchased the north tract, and he lived there until he was about eighteen years old. The Goodmans owned the land until 1893 at which time he joined with other heirs in conveying it to George W. Washington. He testified that his father was not satisfied with the property; *that timber had been cut off of what his father claimed as his land, and that a surveyor was called* and he was present when the survey was made; *that a fence was put through on the survey line,* and that "we stayed on that farm until 1893 and grubbed out some timber on our side up to the survey line and we farmed the land up to the fence. The owner on the other side did the same thing. In my judgment the fence is now where it was then." He testified that he went along with the surveyor and when asked whether the surveyor was hunting for monuments or stones, he answered: "They were establishing a line, is all I know. They wanted a true line." When asked how soon after the survey was made the parties got together and built the line fence, he answered:

"I cannot tell you, *think it was right away, they never had any trouble about it afterward.*" (Italics supplied.)

Walter Harris testified that when a boy he lived about three miles from this land and had visited it a number of times; that he remembered the fence running from the hill to the river, and that "Goodman farmed the land to the wire fence and the man on the other side did the same."

Ed Washington testified that he was born in 1872 on a farm immediately north of the Goodman farm; that he remembered the Deans who owned the farm to the south of the Goodman farm. He testified further:

"There was a fence ever since I can remember in practically the place it is now. My father later bought the Goodman farm, and afterwards we farmed all that land. We took care of the west part of the fence and McAninch took care of the east half. After we acquired the land *we farmed right up to the fence line and the people on the other side did the same.* . . .

"Q. Did you all the time claim you were the *owner of the land up to the fence?*

"Objected to as calling for the conclusion of the witness. Overruled.

"A. *Yes, sir.* Parts of the fence have been washed out by floods and the owners have gone in and built up the fence where it was washed out. Some of the wires were attached to trees. I had never claimed ownership of any of the land south of that fence, and no one ever laid claim to any land on the north side. My brother afterwards acquired an interest in the land that was later sold to Mrs. Wagner. . . . I never heard any controversy arise over that line between the McAninch land and the Goodman land. Nobody ever raised a question that I know of. I don't think anybody made any claims to the land on either side. Until the last few years I never heard any argument about it. *That fence has been known as the dividing line from the time I was a boy."* (Italics supplied.)

He testified further:

"A. *We have always claimed title to the fence line.*

"Q. If they did get into a controversy, *you claimed title to the fence line all the time?* A. *Yes.* (Italics supplied.) . . .

"Q. What you claimed was down to the line according to government survey, wasn't it, isn't that a fact? A. *No, we claimed to the fence."* (Italics supplied.)

Some of his later testimony is rather clouded upon this point, and appellants contend that the witness so modified it as to indicate that all that his father claimed was to "the true line." We think, however, that the court was justified if it concluded that his testimony was that the parties claimed to the fence as a dividing line established after controversy.

Vance Washington, 37 years old and a son of Ed Washington, testified that he worked on the Washington farm and had been familiar with the fence for the last thirty years; that it had been kept up by the parties on both sides, and that it is in the same position as it was when he first knew it.

D. F. Thompson, the appellant, testified on cross-examination as follows:

"Q. And you know that on the other side of that fence line Washington and his successors in title have been farming that land right up to the fence all the time, this timber is part of that line? A. When I first went there, where the fields are they farmed to the fence.

"Q. It is farmed up to the fence now? A. I believe it is.

"Q. West of the creek, as well as on the east side, all the way through there it has been farmed by Washington and his successors in ownership? A. Yes.

Q. And you have never raised any question about it, have you? A. No."

Hugh McAninch testified that he was born in 1886 on the land where the appellant now lives; that the fence is now where it has been ever since he could remember; that during all of that time, the parties farmed up to it on their side; that there was an orchard on the Goodman land which extended to the fence line; that nobody ever questioned the right of those on the north of the line to farm to the fence. He testified further:

"Q. Have you always considered *that line fence to be the division line* between you and the owner on the north?

"Objected to as calling for the conclusion of the witness. Objection overruled.

"A. *We figured it the line between the two farms.*

"Q. You never questioned it? A. There was never any question about it." (Italics supplied.)

While there was testimony from which perhaps a contrary view might be reached, we are here concerned only with testimony in support of the trial court's finding of fact. We think there was substantial testimony to support the findings that in the early 80's there was a controversy as to the dividing line between the two tracts; that a survey was made and a fence erected by the parties, and that for more than fifty years the parties on the south acquiesced and those on the north have continuously claimed ownership and been in open and notorious possession and have farmed the land north of the fence to the fence as a dividing line. Upon such evidence we cannot say that the trial court erred, under the Kansas rule, in finding for the plaintiff.

Lastly, appellants contend that the Dean survey of 1940, from which no appeal was taken, determined adversely appellee's claim of ownership of the disputed strip. The contention is not good. In the first place, there was no evidence and it is not contended that this survey was made under any agreement that it would determine a dividing line. Nor does the record disclose the circumstances under which the survey was made by someone other than the county surveyor as provided in the statute. However, no attack is here made upon the validity of the 1940 survey and that question is not before us. In any event, the survey did not determine appellee's claim of title by adverse possession to the disputed strip. Syllabus paragraph 1 of *Swarz v. Ramala,* 63 Kan. 633, 66 Pac. 649, reads:

"The title to real estate is not put in issue in the determination by a county surveyor, under the provisions of chapter 89, Laws of 1891 (Gen. Stat. 1901, §§ 1797-1824), of the true boundary line between two quarter-sections of land."

In the opinion it was said:

"Adverse possession may change the title to real property, but it cannot change the location of a quarter-section line. Had plaintiff claimed title to the strip of land in controversy *by adverse possession,* absolutely and unconditionally, without regard to location, and demanded a trial by jury to determine this question of title, a different proposition would be presented. This he did not do. *He claimed title to this strip of land only as a part of the northwest quarter.* The condition upon which he claimed was, in the special statutory proceeding, determined against him. In this determination he acquiesced. The condition upon which he claimed having failed, his claim must fail." (p. 637.) (Italics supplied.)

Conversely, location of a surveyor's line cannot determine title to real estate claimed by adverse possession. (*Edwards v. Fleming,* supra, syl. ¶¶ 5, 6, and p. 664; *Roadenbaugh v. Egy,* 88 Kan. 341, 344, 345, 128 Pac. 381; *Gemienhardt v. Ward,* 101 Kan. 250, 167 Pac. 1141; *Boyer v. Champeny,* 125 Kan. 319, syl. ¶ 1, and p. 322, 263 Pac. 1066.)

The judgment is affirmed.