(590 P.2d 589)
No. 49,087

RUSSELL MARTIN, *Appellant,* v. RALPH L. HINNEN, *et al., Appellees.*

Opinion filed February 16, 1979.

*Jack N. Turner,* of Turner Law Offices, Chartered, of Derby, for the appellant.
*James B. McKay, Jr.,* of McKay, McKay and Hargrove, of El Dorado, for the appellees.

Before FOTH, C.J., ABBOTT and REES, JJ.

FOTH, C.J.: This is a boundary dispute between the owners of two adjacent sections of Butler county pasture land. Russell Martin, the plaintiff, owns section 8, the eastern section. Ralph Hinnen, the original defendant, owned section 7 immediately to the west of plaintiff's section at the time this quiet title suit was filed. He died during the pendency of the action and his executors were substituted as defendants. Defendants counterclaimed to quiet their title to the disputed strip of land and for damages. The trial court found title to be in defendants but denied the damage claim. Plaintiff appeals.

During the time this case has been under advisement this court has vainly attempted to find some rationale under which we could either affirm or reverse the judgment below and thus put an end to the litigation. We have reluctantly concluded that the trial court's oral decision, containing the only findings of fact or conclusions of law made, is inadequate to disclose either the controlling facts or the law applied and thus to permit meaningful appellate review. Under those circumstances we have no alternative but to vacate the judgment and remand the case for new findings. *Mies v. Mies,* 217 Kan. 269, Syl. ¶ 3, 535 P.2d 432 (1975). We shall, however, give a brief synopsis of our analysis for such guidance as it may afford the trial court on remand.

The dispute arises because the mile-long north-south fence

dividing the sections is east of the true section line, some 133 feet at the north end and 156 feet at the south end. The effect is to cut a strip off of the west edge of Martin's section 8 and tack it onto the east edge of Hinnen's section 7. The trial court determined the location of the fence with respect to the section line as a finding of fact, and this finding is supported by substantial competent evidence.

The parties are agreed that the fence had been in its present location since at least 1928; just when it was first erected or by whom does not appear. There is no evidence of any dispute over the boundary from 1928 until after the parties acquired their present interests in 1970. During that time through various changes in ownership all persons concerned apparently treated the fence as the true section line.

The issues are complicated by the state of the title over the intervening years. Somewhat simplified (ignoring widows and personal representatives) the situation during the three relevant blocks of time was as follows:

1928-1944: Section 7 owned by Louis and Edwin Hinnen, tenants in common, predecessors of defendant Ralph Hinnen; section 8 owned by one Cameron and his successors.

1944-1970: Section 7 owned by defendant Ralph Hinnen and Edwin Hinnen, tenants in common; section 8 owned by Edwin Hinnen. (In 1944 Ralph bought Louis' half interest in section 7, while Edwin acquired all of section 8 and retained his half interest in section 7. For at least the last ten years of this period Ralph ran cattle on both sections, renting all of section 8 and half of section 7 from Louis' widow.)

1970 to date of suit: Section 7 owned by defendant Ralph Hinnen; section 8 owned by plaintiff Martin. (In 1970 both parties acquired interests from the executors of Edwin Hinnen's widow at auction, Ralph Hinnen acquiring the other undivided one-half interest in his section and Martin acquiring all of his section.)

In the early spring of 1972 a grass fire destroyed the fence between the two sections. Before rebuilding Ralph Hinnen approached plaintiff about a joint survey of the line, but plaintiff refused to join. Each party thereafter rebuilt half the fence, adhering to the long established line. It was some two months later that, as a result of a survey on land to the south of the two

sections, plaintiff discovered that the fence was located on his section. He thereupon ordered his own survey and started to erect a new fence on the line disclosed by it. When Ralph Hinnen objected plaintiff brought this action to quiet his title.

Plaintiff having established record title to the strip, it then became incumbent on defendants to establish that they had nevertheless acquired title from plaintiff or his predecessors in some legally recognized manner. They asserted three possibilities: (1) Adverse possession, either through (a) hostile holding or (b) occupancy in the belief of ownership; (2) a boundary established by agreement, either (a) express or (b) implied; or (3) estoppel.

As to (1)(a), adverse possession by hostile holding, the cases uniformly hold that the possession of land up to a dividing fence or other boundary under the mistaken belief that it is the true line does not constitute a hostile holding. *Edwards v. Fleming,* 83 Kan. 653, 112 Pac. 836 (1911); *Kinne v. Waggoner,* 108 Kan. 814, 197 Pac. 195 (1921); *Wiburg v. Stevenson,* 134 Kan. 530, 7 P.2d 512 (1932); *Steinbruck v. Babb,* 148 Kan. 668, 84 P.2d 907 (1938); *Simpson v. Goering,* 161 Kan. 558, 170 P.2d 831 (1946); *Craig v. Paulk,* 162 Kan. 280, 176 P.2d 529 (1947). Under those and similar cases, only where there is an intent to possess to the fence regardless of where the true boundary is may the possession be said to be hostile. No evidence of such intent was presented here. Since there was no hostility shown the owners of section 7 could have acquired no title to the strip in section 8 by adverse possession requiring hostility.

Those cases also recognize that a boundary might be fixed by agreement, but there must be some evidence from which an agreement may be inferred beyond simple acquiescence in the parties' mutual mistake. Thus in *Kinne* the court observed:

"It is no longer an open question in this state that adjacent landowners are not estopped to dispute the accuracy of a boundary line which by mistake they have long treated as such, nor does the occupancy of land beyond the true boundary line by an encroaching owner form a basis for adverse possession unless the encroachment is made with intention to claim and hold adversely." *Kinne v. Waggoner,* 108 Kan. at 819. Citations omitted.

See also *Hinnen v. Artz,* 99 Kan. 579, 584, 163 Pac. 141 (1917).

The last two cases cited would also seem to dispose of contention (3), estoppel, if based solely on acquiescence. Whether that element entered into the trial court's conclusion is not clear. We

do note that estoppel was not affirmatively pleaded as a defense as required by K.S.A. 60-208(c), nor do we find evidence of any detrimental reliance. *Cf. Place v. Place,* 207 Kan. 734, Syl. ¶ 4, 486 P.2d 1354 (1971).

In the arguments of counsel below and in the trial court's findings there are references to boundaries by agreement, closely coupled with repeated recognition of the parties' and their predecessors' belief of ownership of their respective tracts. On the other hand the trial court found no evidence of "any specific agreements in the chain of title." We take this to mean that plaintiff's rebuilding of the fence in 1972 was not the result of an agreement, and that none of the parties' predecessors specifically agreed that the fence would be the boundary regardless of where the true line might be.

The trial court also refers to the line of cases where "the parties acquiesce in these arrangements, and building of fence lines, and circumstantially prove an agreement between the parties." This language is followed by references to the operation of the sections separately under a "belief of ownership," so we are not certain whether the trial court intended to find an agreement by implication or not.

Our review of the boundary-by-agreement cases indicates there are three general categories. The first includes those cases cited above in which there is no evidence of an agreement except the existence of the boundary and the parties' acquiescence. In those cases, as noted, the court invariably holds there is neither an agreement nor any adverse holding.

The second category encompasses cases where an express agreement is found to exist, based on direct (although sometimes conflicting) evidence. It includes: *Steinhilber v. Holmes,* 68 Kan. 607, 75 Pac. 1019 (1904); *Shafer v. Leigh,* 112 Kan. 14, 209 Pac. 830 (1922); *McBeth v. White,* 122 Kan. 637, 253 Pac. 212 (1927); *Howell v. Kelly,* 129 Kan. 543, 283 Pac. 500 (1930); *Schlender v. Maretoli,* 140 Kan. 533, 37 P.2d 993 (1934); *In re Moore,* 173 Kan. 820, 252 P.2d 875 (1953); and *Landrum v. Taylor,* 217 Kan. 113, 535 P.2d 406 (1975). The trial court, as noted, found no express agreement, so those cases are inapplicable here.

The third category includes cases where there was no direct evidence of an agreement but the parties through their conduct showed circumstantially that there was an agreement. Our read-

ing of those cases indicates that in each there was something more than mere acquiescence in an existing line: *Kyte v. Chessmore,* 106 Kan. 394, 188 Pac. 251 (1920) (after dispute, surveyor fixed line, parties built fence on it and acquiesced thereafter); *Blanford v. Biven,* 123 Kan. 269, 254 Pac. 1030 (1927) (seller of lots went out with respective buyers, located boundaries at edge of sidewalk); *Wagner v. Thompson,* 163 Kan. 662, 186 P.2d 278 (1947) (parties built fence on line established by survey); *Beams v. Werth,* 200 Kan. 532, 438 P.2d 957 (1968) (when county purchased land county surveyor staked the boundary, seller erected fence along stake line); *Moore v. Bayless,* 215 Kan. 297, 524 P.2d 721 (1974) (parties jointly measured their tracts with a wagon wheel, located their boundary at an Osage Orange hedge, and built a fence through the hedge). In each of those cases there was no evidence as to the discussion between the parties, but their conduct was such that an inference of an agreement was held to be reasonable. Acquiescence after the agreement was apparently made was simply additional circumstantial evidence of its existence.

Two additional "agreement" cases deserve mention. In *Fyler v. Hartness,* 171 Kan. 49, 229 P.2d 751 (1951), the court affirmed by four-to-three a finding of boundary-by-agreement where owners of adjoining city lots purchased when a dividing fence was in existence; they were told and believed it was the boundary; and the house on one lot encroached some three feet onto the other. The majority thought the parties and their predecessors' long-standing recognition of the line showed an agreement circumstantially; the dissenters thought the evidence showed at best mere acquiescence. The case appears to be an anomaly in an otherwise consistent pattern of decision in this state, although, like most agreement cases, the result was to uphold the factual finding of the trial court. It may well be explained by equitable considerations arising from the physical encroachment of the house, which preexisted the purchase by the parties to that suit.

The other case of note is our Supreme Court's more recent pronouncement in *Fritzler v. Dumler,* 209 Kan. 16, 495 P.2d 1027 (1972). In that case, plaintiff sold a portion of his land and pointed out to the buyer a tree line as the boundary between the land sold and retained. The buyer sold to defendants, making the same representation. It turned out that the tree line shorted the

buyer by some 7½ feet. The trial court found there was no agreement, and the finding was upheld on appeal. The key element missing in that case was a dispute as to where the boundary should be, so that it could be said that an agreement was reached to resolve it. The statements as to the tree line, the court said, were for information purposes only, and were not intended to be an agreement. The court went on to say:

"With respect to plaintiffs' claim of acquiescence, that term, as applied to a boundary line controversy, is defined as a consent to the conditions and involves knowledge of them. It involves more than a mere establishment of a line by one party and the taking of possession by him. There must be knowledge on the part of the other party. The line acquiesced in must be known, definite and certain or known and capable of ascertainment. (12 Am. Jur. 2d, Boundaries, § 85, pp. 620-621.) In the case at bar Fritzler established the tree line when he was owner of all the property; neither Anschutz nor Dumlers were in the picture." 209 Kan. at 22-23.

This statement, as we view it, is consistent with the long line of earlier cases. Nothing can be inferred from acquiescence in a boundary unless the acquiescing party *knew* his land was being encroached upon, or at least that the line was in dispute. And, of course, if the encroaching party has the same knowledge his possession is hostile and adverse.

In this case the two sections were under separate ownership during two periods, 1928-1944 and 1970-1972. There appears to be no evidence other than acquiescence which would establish an agreement during the earlier period, nor any during the latter except the rebuilding of the fence, which the trial court apparently rejected as evincing an agreement. During the interim 1945-1970, Edwin, and later Alma, owned on both sides of the fence. Obviously neither could secretly "agree" with himself or herself as to the boundary so as to bind a grantee to whom the land was described by section line, without reference to the fence.

Finally, we come to possession under a belief of ownership, as contemplated by K.S.A. 60-503 since its 1964 effective date (see *Armstrong v. Cities Service Gas Co.*, 210 Kan. 298, 502 P.2d 672 [1972]). It may well be that this doctrine was the basis for the trial court's decision, but if so, we are unable to see how it could justify a finding that defendants acquired a complete fee interest, instead of just an undivided one-half.

We start with the proposition that the belief of ownership

concept had no applicability to the 1928-1944 period when the Louis and Edwin Hinnens owned section 7 and strangers owned section 8. For the Hinnens to have acquired title to the strip during that period would have required a hostile holding, and we have observed that there was no evidence of hostility. As for the 1970 period onward, the period was too short for Ralph Hinnen to acquire title as against plaintiff.

The 1944-1970 period was sufficient in length for the owners of section 7 to have acquired title to the strip in 8 under a belief of ownership, except that one of the owners of 7, Edwin (and later Alma) in fact owned all of section 8. Hence Edwin could not acquire title to the strip as against himself; at best his "belief of ownership" as to the strip was a mistaken belief that he owned only a half interest whereas he in fact owned it all.

As to Ralph, during this time he owned a half interest in section 7 and thought he also owned a half interest in the strip of section 8. During at least the last ten years he recognized his cotenant's half interest in 7 by paying rent for the use of that interest. He also paid rent for the use of all of section 8. If we assume that the rent paid was only for a half interest in the strip, it may be argued that as to the other half interest he was in open and exclusive possession under a belief of ownership. He clearly was not in possession of the strip under a belief that he was the *sole* owner.

Thus, even taking the evidence on this point in the light most favorable to the prevailing parties below, Ralph could have acquired at best an undivided one-half interest in the strip by adverse possession under a belief of ownership, as against Edwin. Under this theory, when Alma's executors executed their deeds to the parties in 1970 they owned an undivided interest in section 7, a one-half interest in the strip of section 8 west of the fence, and all of section 8 east of the fence. The deed to plaintiff of all their interest in section 8 would carry with it their one-half interest in the strip remaining after the loss of one-half to Ralph. Their deed to Ralph of a one-half interest in section 7 would not carry with it any interest in section 8.

We note in this connection the long recognized rule that while a survey does not affect the title to property, conversely "[a]dverse possession may change the title to real property, but it cannot change the location of a quarter-section line." *Swarz v. Ramala,* 63 Kan. 633, 637, 66 Pac. 649 (1901). See also *Edwards v.*

*Fleming,* 83 Kan. 653, 664, 112 Pac. 836 (1911); *Roadenbaugh v. Egy,* 88 Kan. 341, 345, 128 Pac. 381 (1912); *Wagner v. Thompson,* 163 Kan. 662, 670, 186 P.2d 278 (1947).

In short, we are unable to tell whether the trial court found a boundary by agreement and, if so, who the parties were or on what evidence it relied. Neither can we tell whether the finding was one of adverse possession and, if so, who acquired what title, when, or on what evidence. We know only that on the present state of the record we cannot affirm a finding that defendants own a complete fee interest in the disputed strip.

The judgment is vacated and the case is remanded for further proceedings in harmony with this opinion, including the entry of new findings of fact and conclusions of law.