No. 46,317

RICHARD A. ARMSTRONG and BETTY GRISHAM, *Appellants,* v. CITIES SERVICE GAS COMPANY and THE KANSAS POWER AND LIGHT COMPANY, *Appellees.*

(502 P. 2d 672)

November 4, 1972.

*Dean Burkhead* and *Eugene C. Riling,* of Riling, Riling and Burkhead, of Lawrence, argued the cause and were on the brief for the appellants.

*Terry L. Bullock,* of Cosgrove, Webb and Oman, of Topeka, argued the cause and was on the brief for appellee The Kansas Power and Light Company.

*Charles D. Stough,* of Lawrence, argued the cause, and *Jack W. Wertz* and *George E. Peabody,* both of Oklahoma City, Okla., were with him on the brief for appellee Cities Service Gas Company.

The opinion of the court was delivered by

HARMAN, C.: Initially this proceeding was one by landowners to eject two utility companies from their land and to quiet their title thereto. Subsequently the plaintiffs sought to convert the action into one for damages for inverse condemnation by reason of the maintenance of utility facilities on their property. In trial to the court it was held that the defendant utilities had acquired prescriptive easements. Plaintiffs have appealed from the judgment against them entered on that ruling.

The evidence submitted to the trial court was in the form of depositions, affidavits, exhibits, answers to interrogatories and stipulations, and with a single exception the facts developed thereby may be said to be undisputed.

The real estate in question consists of a half-section lying east of U. S. Highway 59 immediately south of the city limits of Lawrence, Kansas. In 1915 the then owner of the tract, W. H. Armstrong, executed his will. Insofar as here material a life estate was

devised to Leland O. Armstrong, grandson of the testator, subject to the right of possession, control and income from the real estate to the testator's wife, Anna M. Armstrong, for the term of her natural life. Upon termination of the life estate of Leland, the will devised the remainder to any children born to said grandson in lawful wedlock who survive him. Leland's life estate was subject to certain restrictions:

"If . . . Leland O. Armstrong, shall at any time, or in any way make, execute or deliver any deed, mortgage, lease, equipment or any instrument in writing purporting or attempting to grant, convey, sell, mortgage or otherwise alienate said real estate, except to lease or rent the same for a period of not more than three years at any one time, or if he should suffer or allow the taxes or assessment levied on said real estate to be in arrears more than two years, or if the said life estate in said real estate shall be sold to satisfy the judgments of any court rendered against him, then and in such an event . . . *the life estate . . . shall cease, determine and be forfeited and said real estate shall thereupon pass to such person or persons as would be entitled to the same if my said grandson, Leland O. Armstrong, had died.* But . . . that said forfeiture shall not operate to defeat the interest of any child born to . . . said grandson, in lawful wedlock, after such forfeiture." (Emphasis supplied.)

W. H. Armstrong died in 1916. Final settlement of his estate under the will was made in March, 1919, in proceedings in the probate court of Douglas county, Kansas. His widow, Anna M. Armstrong, died in April, 1919.

Leland O. Armstrong was born November 25, 1904. He is still living and was a party defendant in the trial of this action. The plaintiff-appellants are the two children born to Leland and his wife, Eleanor. Richard A. Armstrong was born December 5, 1926, and became of legal age December 5, 1947; Betty J. Grisham was born December 7, 1931, and became of legal age December 7, 1952.

The defendant-appellees, Cities Service Gas Company and the Kansas Power and Light Company, are each corporations. Cities is in the business of purchasing, transporting in an integrated pipeline system and selling natural gas in Texas, Oklahoma, Kansas, Missouri and Nebraska. KP&L owns and operates transmission lines for transportation and sale of electricity in Kansas. Both companies have the power of eminent domain for the purpose of acquiring land for right-of-way for construction of such lines and facilities.

In 1905 the testator, W. H. Armstrong, and his wife, Anna, granted a right-of-way easement to the Kansas Natural Gas, Oil Pipe Line

and Improvement Company through the south half of the subject property and a twelve-inch pipeline was installed in that year. The easement was assigned to Cities in 1927 and the pipeline was reclaimed by it and removed from the property in late 1936 or early 1937. Upon reclaim, damages were paid by Cities to the grandson, Leland O. Armstrong. During the time the line was located through the property, a domestic tap and meter were provided for the use of gas at the principal dwelling house located upon the property. The easement and assignment were duly filed of record.

Commencing in 1929 and extending through August, 1946, Leland and his wife, Eleanor, granted to Cities two pipeline right-of-way easements and a meter and regulator lease through the north half of the subject property. In 1944 they granted an easement to Kansas Electric Power Company (later merged into KP&L) for the construction and operation of an electrical transmission line over the property. These grants were perpetual and in no way limited. The first time that either Cities or KP&L was made aware that the grants were from a life tenant was by a letter dated December 5, 1968, from one of appellants' attorneys, two weeks prior to the filing of this action.

The first grant of a pipeline right-of-way easement to Cities was in 1929. Leland was paid for the grant of this right-of-way. A sixteen-inch gas pipeline was installed through the property under such contract in that year. Leland was also paid for crop damages in connection with installation of the pipeline. The pipeline has been continuously used for transmission of natural gas to the present time. This easement contract was mailed by a tenant on the property to Leland and his wife who were then living in California. The Armstrongs executed the instrument without any contact with Cities or a Cities representative. This easement was filed of record in 1929.

In 1939 Leland and his wife, Eleanor, executed a second right-of-way easement to Cities for the installation of a pipeline through the property and in that year a six-inch pipeline was installed extending from a point on the existing sixteen-inch pipeline through said property in a northerly direction as part of a project for transmission and delivery of gas for use by Kansas University. This pipeline has been used continuously since its installation to the present time. Leland was paid for this right-of-way grant and for damages resulting from installation of the pipeline. Prior to acquir-

ing the easement, Cities obtained a list of names of owners of the affected realty from John C. Emick, a licensed bonded abstractor at Lawrence, Kansas. That list showed Leland as owner of the subject property. The easement was filed of record in 1939.

In August, 1942, a letter was written to Cities requesting a domestic tap for gas service from one of the pipelines running through the property. The letter bore the signature name L. O. Armstrong, and was written by Eleanor, his wife, with his consent and at his request. Additional correspondence was had regarding the furnishing of gas service for domestic use on the property. Such letters from L. O. Armstrong did not indicate any limitation of ownership to a life estate, but to the contrary, used the words "my farm". In 1942 a domestic meter and regulator were installed upon the sixteen-inch pipeline extending through the property and domestic gas service has been extended and utilized on it continuously since that time.

In 1943 the Kansas Electric Power Company agreed to supply electric energy to the Sunflower Ordnance Works. In connection with the construction of the transmission lines for this project it was necessary to cross the Armstrong land. Because of the size and urgency of the project and the shortage of personnel, KEPC contracted with S. A. Sulentic for the surveying of the line and the acquisition of the necessary easements for rights-of-way. Sulentic was a consulting engineer in Topeka, Kansas, and was not on the staff of KEPC. Sulentic and his employees laid out the Sunflower Ordnance line and purchased the easements for rights-of-way used in conection therewith, except such as were acquired through condemnation. Among the easements obtained by Sulentic for the line was that evidenced by a written grant of right-of-way executed by Leland O. Armstrong and his wife to the KEPC in February, 1944, covering the property in question. Leland was paid the full price for the easement which was filed of record in February, 1944.

In connection with the acquisition of such easements Sulentic obtained from Frank E. Banks, a licensed bonded abstractor doing business in Douglas county, a list of owners of the tracts of land in that county over which the transmission line was proposed to be and was subsequently constructed. A copy of this list of owners of property, from whom easements were secured by Sulentic, was furnished to KEPC, which list included the names of L. O. and Eleanor Armstrong.

Upon completion of construction of the electric transmission line, the prime contractor for KEPC delivered a release signed by L. O. Armstrong covering crop and property damages in installation of the line.

In 1946 the contract for the sale of gas by Cities to Kansas University was turned over to the distributor of gas in Lawrence, Kansas, and a town border station was established on the six-inch pipeline at a point north of and not located upon the subject property. This station was established for the purpose of delivering gas for distribution in Lawrence, Kansas. In August, 1946, a meter and regulator lease was executed by Leland and his wife, Eleanor, which lease was filed for record in September, 1946. This lease was for a term of ten years with the right in Cities to renew the lease year-to-year thereafter upon payment of ten dollars annual rent.

In 1946 Cities installed a regulator and regulator house located above ground upon the real property in question, which facilities have continuously been utilized and maintained by Cities since that time. Pursuant to the terms of the lease, Cities has paid to Leland the sum of $10.00 each year commencing in August, 1946, and extending to the date of commencement of this action.

During the months of August through December, 1946, KEPC dismantled and removed the Sunflower Ordnance line. All easements for rights-of-way used in connection with the line were reserved and held for future use. The contract for the dismantling and removal of the line was let by KEPC to a Lawrence construction company in July, 1946. Pursuant to the terms of this contract, the contractor was to secure and deliver to KEPC releases signed by the owners of the fee title of the pertinent properties, releasing KEPC from any and all liability for damages incurred in connection with such dismantling and removal. Upon completion of this contract, the construction company delivered to KEPC a release signed by Leland pertaining to the subject property.

In June, 1949, the Kansas Elecrtic Power Company merged into KP&L and its properties, including all easements became vested in KP&L.

During the months of December, 1950, through February, 1951, KP&L reconstructed its Sunflower Ordnance line over the Armstrong land, utilizing the prior easement granted by the Armstrongs. Again KP&L received from the contractor building the line a release

executed by Leland as landowner for damages incurred during reconstruction.

Periodically—Cities commencing in 1927 and KP&L in 1951— each appellee executed and filed of record mortgages in connection with its financing in which each mortgaged its property including the easements in question and in which each warranted it owned the property covered by the indentures and that such property was free and clear of any encumbrance affecting the title.

In November, 1961, Leland and Eleanor leased a portion of the property to one Ward Shull for the purpose of operating a golf course thereon. In 1962 Shull took possession of the land under this lease, which was for five years with an option to renew for a like period, and has continued to operate a golf course upon it. In March, 1962, Leland requested Cities to furnish an additional gas tap on the property to serve the buildings on the golf course. In May, 1962, a domestic meter and regulator were placed on the sixteen-inch pipeline, extending above the ground level, for the purpose of providing domestic gas service to the property.

The facts presented to the trial court also included the depositions and affidavits of several senior officers of each utility who continuously were concerned and familiar with the purchase and holding of easements by each company. These instruments showed the custom and practice of each in obtaining easements, their knowledge of all company records and demonstrated the belief of each company that it owned the easements in question.

The parties stipulated that from and after July 20, 1929, September 13, 1939, and August 28, 1946, Cities has been in the open, exclusive and continuous possession of the easements of right-of-way and the meter and regulator lease executed by Leland and Eleanor on those dates respectively, and that from and after February 25, 1944, KP&L and its predecessor in title have been in the open, exclusive and continuous possession of the transmission line easement executed by Leland and Eleanor on that date.

It was further stipulated that the appellants Richard Armstrong and Betty Grisham have been aware of the existence of the pipelines and related facilities and the transmission lines extending through the subject property for a period in excess of fifteen years prior to the commencement of this action.

The record reveals that the concern over the restrictive terms of the 1915 will which eventually led to this lawsuit developed in 1967 when Douglas county constructed a new sanitary sewer

system and established a sewer district embracing a part of the Armstrong land. Following construction, assessments were levied against the lands affected; that levied against the Armstrong land was so large it could not be met unless the land could be subdivided and sold—which course could not be pursued in view of the testamentary restrictions upon Leland, the then life tenant. Accordingly Leland and his two children joined in some kind of declaratory judgment action brought in January, 1968, to terminate the life tenancy and to place fee title in the remaindermen, appellants herein, which apparently was done. On December 3, 1968, Leland executed and delivered a warranty deed to the premises to his children, who on December 19, 1968, commenced this action against appellees.

Further evidence presented at trial will be mentioned in connection with the issues raised by the parties.

The trial court entered the following findings and conclusions:

"Over the years beginning in 1929 and periodically since, the life tenant had granted certain easements for gas pipelines and a meter and regulator lease to Cities and an easement for a power line to K. P. & L. And on the theory that they had not joined in such grants, plaintiffs, by the instant suit, are demanding that such grants be declared void as to plaintiffs and if such be adjudged that plaintiffs then be permitted to seek the same amount from K. P. & L. and Cities as would be granted if such utilities were now condemning such rights in said land.

"Under the pre-trial order the basic issue is whether or not K. P. & L. and Cities have acquired the respective rights they now possess in the land in question by adverse possession against plaintiffs.

"In view of stipulations numbered 55 through 70, it is a fact plaintiffs have been aware of the gas pipelines and related facilities and of the power line, all of which extend through and are upon the land in question, for a period of more than 15 years prior to the commencement of this action. From the entire record, including but not limited to all affidavits, exhibits, depositions and stipulations, the following statements are by the Court found to be proven facts: that from and after July 20, 1929 Cities has been in the open, exclusive and continuous possession of the easement shown by Exhibit C under a belief of ownership; that from and after September 13, 1939 Cities has been in the open, exclusive and continuous possession of the easement shown by Exhibit D under a belief of ownership; that from and after August 28, 1946 Cities has been in the open, exclusive and continuous possession of the property described in the meter regulator lease shown by Exhibit X under a belief of ownership; and that from and after February 25, 1944 K. P. & L. or its predecessor in title and interest, has been in the open, exclusive and continuous possession of the easement shown by Exhibit S under a belief of ownership.

"An examination of the instruments by which the life tenant and his wife granted the above mentioned easements to K. P. & L. and to Cities reveals

that such grants were perpetual and in no way limited. The first time since the original grant of an easement to Cities in 1929 that Cities was made aware of the claim that it had only a grant from a life tenant was by letter dated December 5, 1968 from one of plaintiffs' attorneys in which such contention was asserted. Similarly the same claim was addressed to K. P. & L. by letter of December 5, 1968 from such attorney. This suit was filed December 19, 1968.

"From the entire record it is concluded that:

. "1. Cities and K. P. & L. respectively have acquired the easement and other rights in the subject real estate as described in the several exhibits hereinbefore mentioned by prescription as against plaintiffs and plaintiffs' action as against defendants Cities and K. P. & L. is barred by the applicable statutes. (K. S. A. 60-503; and K. S. A. 58-2523)

"2. K. S. A. 60-503 is a valid enactment. (53 C. J. S. Lim. of Actions, Sec. 2.)

"In light of the foregoing conclusions it is unnecessary to consider or determine the other issues framed by the pre-trial order."

At this point it may be noted that "the other issues framed by the pre-trial order", mentioned in the trial court's memorandum, specifically included the defense of the statutes of limitations (K. S. A. 60-507, 60-508), as well as those of laches and estoppel.

Appellants first attack the trial court's finding respecting appellees' belief of ownership. They assert appellees could not have entertained a valid belief of ownership of perpetual easements because of evidence offered by them consisting of statements allegedly made by Eleanor Armstrong. Eleanor testified in her deposition she had on several occasions stated to representatives of appellees that she had no right or need to sign the easements because her husband had only a life estate in the property. Appellants also point to the fact one of the releases contained the typed name "Anna M. Armstrong" —which fact remains unexplained in the record. Appellants' contention may be quickly disposed of. Eleanor's testimony illustrates the one area of disputed fact in the case, that is, whether appellees entertained a belief of ownership with respect to the easements. The trial court held they did. This finding was one of fact and the evidence in the record supports that finding. No useful purpose would be served by further detailing that evidence. A mass of credible testimony and exhibits offered by each appellee concerning its acts manifested a bona fide and reasonable belief of ownership of the easements. Appellees paid the going rate for perpetual easements, they promptly recorded the instruments granting them and they entered the property and made substantial expenditures in the installation and maintenance of their facilities. On the other

hand, the testimony of Eleanor, offered by appellants in opposition, was not considered credible by the trial court. It did contain considerable vagueness and ambiguity and some contradition and hedging when she was closely pressed. Admittedly, no representative of Cities had any contact either with Mr. or Mrs. Armstrong when in 1929 they signed the first easement in California. More importantly, her assertion that she had in the presence of her husband informed appellees' representatives of the true nature of her husband's interest in the property was contradicted by the latter's own testimony. The trial court's finding resolved any factual difference against appellants.

Appellants argue their parents were coerced into signing the easements because appellees had the power of eminent domain and those involuntary acts should be excused. No issue of this kind was ever raised at trial, nothing in the record supports it and the matter can only be termed an afterthought.

Appellants also assert no prescriptive easement could arise against them because they first became entitled to possession of the property in 1962 and the fifteen year period of prescription did not begin to run against them until that time. Appellants select the year 1962 as the date they became entitled to possession because it was then that Shull entered the property under the ten year golf course lease granted by Leland in violation of the terms of his grandfather's will (although of relative insignificance it may be noted that as late as December 5, 1968, in their letters to appellees, appellants were contending Leland's life estate terminated when he first granted Cities' easement in 1929).

Appellants do not take into account the impact of K. S. A. 58-2523, which provides:

"A person seized of an estate in remainder or reversion may maintain an action for waste or trespass for injury to the inheritance, notwithstanding an intervening estate for life or years."

In *Clark v. Butler Rural Electrification Ass'n*, 177 Kan. 344, 279 P. 2d 240, this court construed that which is now 58-2523 in a situation analogous to that at bar. There, in 1945, the fee owner, plaintiff's mother, conveyed a perpetual transmission line easement to the defendant utility. The easement was not recorded and no lines were erected at that time. In 1947 the mother conveyed the property to her son, the plaintiff, reserving in herself a life estate. Lines were constructed in 1948 and 1949. The mother died in 1953. Thereafter the plaintiff promptly filed suit against the utility for

ejectment and for damages. A particular statute applicable to electric co-operatives provided a two year period of limitation within which to bring actions concerning transmission line easements maintained without consent of those legally entitled to object (G. S. 1949, 17-4627). This court treated maintenance of the lines as an injury to the estate, of which plaintiff had notice. Plaintiff contended his cause of action arose only when his estate became possessory. This court rejected the contention, holding that under the provisions of the statute quoted above plaintiff had the right as remainderman to prosecute the action for any damage to the remainder estate and further that his failure to do so after two years continuous maintenance of the lines barred the suit.

Under the rationale of *Clark* it is immaterial that in the instant case the trial court made no specific determination as to when Leland's life estate terminated.

Appellants argue there was no trespass as revealed in *Clark* because Leland Armstrong could give a lease; however, Leland could encumber the property only for a three year period—he had no authority to make an unlimited perpetual grant as he in fact made. Also to be borne in mind is the stipulated fact that appellants had knowledge of the maintenance of the utility facilities for more than fifteen years prior to the commencement of this action.

Appellants further argue the utilities' initial entries were permissive and could never ripen into prescriptive rights. In support they cite cases under our adverse possession statute in effect prior to January 1, 1964, which are inapplicable. Our present statute, K. S. A. 60-503, provides:

"*Adverse possession.* No action shall be maintained against any person for the recovery of real property who has been in open, exclusive and continuous possession of such real property, either under a claim knowingly adverse or under a belief of ownership, for a period of fifteen (15) years. This section shall not apply to any action commenced within one (1) year after the effective date of this act."

The statute contains nothing limiting its application to any particular type of situation. In *Stark v. Stanhope,* 206 Kan. 428, 480 P. 2d 72, we had this to say respecting it:

"The section became effective January 1, 1964, and amended G. S. 1949, 60-304, *Fourth.* Formerly, the elements of the possession were required to be 'notorious' and 'hostile,' but the new section eliminated the element of hostility as essential of adverse possession and changed the common-law conception of the doctrine. It is still necessary, however, to succeed on a claim of title by adverse possession, that the possession shall have been 'open, exclusive and

continuous' for the statutory period. In lieu of an adverse or hostile holding, the claim may be based on . . . 'a belief of ownership.' " (p. 432.)

In Gard, Kansas Code of Civil Procedure, Annotated, § 60-503, the author comments respecting a claim based on belief of ownership:

"This concept may present some difficulties as it makes the belief or the state of mind of the possessory claimant a relevant matter. Belief is distinguishable from intent. They are not synonymous. Unless he has made statements to someone evidencing a contrary mental attitude it is a bit difficult to challenge effectively the testimony of a person as to his belief. Hostility, on the other hand, is ordinarily a matter of intent and is evidenced by conduct, verbal or otherwise, and much more susceptible to an effective factual inquiry than the issue of belief.

"It can hardly be denied, however, that the new provision may serve a beneficial purpose from the standpoint of the public generally. The uncertainty of boundary lines presents problems of considerable concern. It is probably more realistic to resolve such disputes on the basis of mistaken belief on the part of the party who has been in open, exclusive and continuous possession, than on an intent to hold adversely and in hostility to the adjoining owner. At least the 'belief' concept has more of the element of good faith than the 'hostility' concept which is essentially a matter of bad faith intent to acquire something one does not own, by the process of claiming it.

"It goes without saying that the rule of this section recognizing the element of belief in ownership cannot apply where there has been a recognition of the uncertainty of the boundary location. Where that is true nothing short of intentional adverse holding will suffice to support the claim." (p. 522.)

In 5 Vernon's Kansas Statutes Annotated, Code of Civil Procedure, § 60-503, Professor Melvin C. Poland makes these comments:

"In the language of the statute 'belief of ownership' has been substituted for the common law element of 'hostile' holding. It may be assumed the change will make it more difficult to challenge the character of the holding, belief being a state of mind whereas hostile holding involves an intent, normally evidenced by overt acts or statements in respect to such holding. While it may be argued that legislation should not be designed to make acquisition, by a possible criminal act, of ownership of property easier to obtain, it must be admitted that the two-fold policy behind statutes of limitation (the curtailment of stale claims, and the rewarding of the individual who has made beneficial and productive use of the land over a long period of time) will be accomplished more often under the new concept of 'belief of ownership' established by the statute." (p. 7.)

Thus we see statutory authorization of a doctrine of adverse possession (or prescription in the case of easements) which gives protection to those who in good faith enter and hold possession of land for the prescribed period in the belief it is theirs. The doctrine, of course, is based on the running of the statute of limitations

applicable to the recovery of the property. The rationale for the enactment of this type of statute is expressed in 3 Am. Jur. 2d, Adverse Possession, § 2, thus:

"Modern statutes of limitation operate, as a rule, not only to cut off one's right to bring an action for the recovery of real property which has been in the adverse possession of another for a specified time, but also to vest the disseisor with title. These enactments rest on a wise public policy, which regards litigation with disfavor and aims at the repose of conditions which the parties have suffered to remain unquestioned long enough to indicate their acquiescence therein. The purpose of these enactments is to quiet title to land, and neither the power of the legislature to do so, nor the wisdom of so doing, is open to question. They have therefore been emphatically and justly denominated statutes of repose. The intention is not to punish one who neglects to assert his rights, but to protect those who have maintained the possession of land for the time specified by the statute under claim of right or color of title.

"The establishment of title by adverse possession is said to be based on the theory or presumption that the owner has abandoned the land to the adverse possessor. It has also been said that the doctrine of maturing title by adverse possession under color of title is that where one, in the exercise of ordinary care, is induced to enter upon and improve land because he has some written evidence of title that would naturally induce a layman to believe that it vested in him what it professed to pass, it would be unjust to enforce the right of another who brings no action until the end of the statutory period." (pp. 80-81.)

Appellants rely on cases ruling that as against the devisees of an estate in remainer the possession of the estate by the life tenant, or by persons to whom the life estate has been conveyed, does not start the running of any statute of limitations or prescription during the lifetime of the devisee of the life estate. Such possessions by their very nature could only be permissive and lack of adverse holding was the basis of these cited cases. Typical of them are *Peck v. Ayres,* 79 Kan. 457, 100 Pac. 283, and *Dewey v. McLain,* 7 Kan. 126, which were concerned with *hostile* holdings of realty—the only type of possession under which prescriptive rights could then be acquired. They simply are not relevant where rights are asserted under the belief of ownership concept in our present statute in which hostility is not an element.

The element of hostility in the old method oftentimes smacked of the element of bad faith as, for example, the squatter who knew he had no semblance of right could become vested with good title (see Gard, supra, p. 522). We have no hesitation in concluding that under the new belief of ownership concept the legislature had in mind an element of good faith, that is, the belief must be in good faith and reasonable under all the facts and circumstances.

The will of W. H. Armstrong was admitted to probate in Douglas county. This instrument revealed the limited estate and authority of Leland O. Armstrong. Probate courts are courts of record and it has long been held that their records constitute constructive notice of the matters therein contained (*Walline v. Olson*, 84 Kan. 37, 113 Pac. 426). The question arises as to the effect, if any, of constructive notice to be derived from this recording, such notice being that which is imputed by operation of law.

The doctrine of constructive notice sufficient to commence operation of the statute of limitations was examined in *Black v. Black*, 64 Kan. 689, 68 Pac. 662. The action was one for fraud brought by children against their mother who had acted as administratrix of their father's estate and as their guardian. As required by law prior to the closing of the estates the mother filed in the probate court true accounts of her transactions, which activities constituted the alleged fraud. The fraud action was not brought until eight years after the youngest child had attained majority and the guardian's account had been closed. This court held:

"The phrase, 'until discovery of the fraud,' in . . . the code . . ., which provides the limitation of two years in case of 'action for relief on the ground of fraud,' and which also provides that 'the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud,' does not necessarily mean until the party complaining had *actual notice* of the fraud alleged to have been committed, for constructive notice of the fraud is sufficient to set the statute in motion even though there may be no actual notice. Where the means of discovery lie in public records required by law to be kept, which involve the very transaction in hand, and the interests of the parties to the litigation, the public records themselves are sufficient constructive notice of the fraud to set the statute in motion." (Syl. ¶ 2.)

The foregoing rule was iterated in *Hutto v. Knowlton*, 82 Kan. 445, 108 Pac. 825, but the court added to it this explanation and caution:

"The rule [in *Black*] was admirably expressed, but the foundation of it was not so definitely stated, and may be said to consist in this: Where a public record is required by law to be kept as a source of information respecting property rights and interests a duty rests upon anyone to whom the information is material to improve with diligence the opportunity of learning that which the record discloses. It follows that if the opportunity be neglected the interested person will be bound to the same extent as if he had in fact examined the record. *But the rule is no broader than its basis, and if for any reason no obligation exists to consult the record,* or if the interested person be circumvented from taking advantage of his opportunity, *the rule does not obtain.*" (pp. 448-449.) (Emphasis supplied.)

The rule respecting constructive notice to be imparted a claimant relying in good faith on adverse possession by reason of a belief of ownership is stated in 2 C. J. S., Adverse Possession, § 170b, in this fashion:

". . . [I]t is a well established rule that constructive notice of a defect in the title is not sufficient to impeach the good faith of claimant since he is under no duty to examine the conveyance records imparting such notice. 'If no one could invoke successfully the prescription statute who could have discovered by an examination of the public records before buying the property that the seller had no title, the plea would never be available because no one could invoke it except one having a valid title and having therefore no need for prescription.' If a claimant actually knows that his title has no validity whatever, then it cannot be said that he acquired his color of title or made his claim of right, title, or possession in good faith." (p. 745.)

Also, in 3 Am. Jur. 2d, *ibid.,* § 98, we note this statement:

". . . [I]t is generally true that one is not required to examine the public records regarding the title to real property he contemplates purchasing as a condition precedent to good faith. . . ." (pp. 181-182.)

We are satisfied with the soundness of the foregoing rules and approve and adopt them. The very doctrine of adverse possession presupposes a defective title in the one claiming under it, but for which there would be no reason to claim title by adverse possession. It is a ripening of certain types of possession into title by the lapse of time (3 Am. Jr. 2d, *ibid.,* § 1). The Kansas legislature has authorized that possession to be under a belief of ownership, which concept may not be judicially nullified.

In the case at bar appellees or their predecessors in title relied directly or through agents upon abstracters' certificates of ownership—a not uncommon practice by utilities and others in acquiring rights in the nature of easements. The facts established in the record disclose neither appellee had any knowledge of any defect in title until receipt of the December 5, 1968, letters from appellants' attorneys. Prior to this time Leland and his wife had continuously represented Leland to be the owner of the premises. As late as 1961, in the Shull lease, they represented that Leland's ownership was without limitation. Appellants did nothing while appellees constructed and maintained their facilities on the land although they were aware of this activity. There is nothing shown in the record giving rise to any obligation on the part of the appellees to consult the probate court record.

The question of what constitutes good faith in one claiming to hold property under a belief of ownership is a question for the

trier of the fact (*Wright v. Mattison,* 59 U. S. [18 How.] 50, 15 L. ed. 280). As already indicated the evidence in support of appellees' belief of ownership was overwhelming and no facts were established which impugn in any way their good faith in maintaining this belief.

Appellants assert the concept of claiming "under a belief of ownership", as authorized by K. S. A. 60-503, should not be applied retrospectively and that to do so would unconstitutionally deprive them of their property without due process. The argument is the fifteen year period under this concept should not commence until the effective date of the new statute—January 1, 1964. The only case cited in support of this argument is *Davis, Administrator v. Union Pacific Railway Co.,* 206 Kan. 40, 476 P. 2d 635. This case involved constitutionality of a statute enacted to cure, retroactively, deeds recorded prior to the date of a particular decision of this court construing a deed purporting to create a joint tenancy in real estate. This court held that rights had become vested by reason of the former decision and the legislature could not enact statutes the effect of which would be to impair those rights. The decision has no application to the case at bar.

The general rule respecting constitutionality of statutes of limitations is stated in 53 C. J. S., Limitations of Actions, § 2, as follows:

"The legislature has power to enact statutes of limitation; it may enact a statute which limits the time within which actions may be brought to enforce demands where previously there was no period of limitation or it may change the existing statute of limitations. It may prescribe different periods of time within which different species of obligations may be enforced. Such statutes have usually been sustained as against various particular objections.

"As to existing causes of action, a statute of limitations must afford a reasonable time for the commencement of an action before the bar takes effect. If the statute operates immediately to cut off the existing remedy, or within so short a time as to give the party no reasonable opportunity to exercise his remedy, then the retroactive application of it is unconstitutional as to such party. The time allowed cannot be pronounced unreasonable unless it is so short as under the circumstances to amount to a practical denial of the right itself." (pp. 906-907.)

Kansas has adhered to the foregoing in many decisions (see e. g., *State, ex rel., v. Board of Education,* 137 Kan. 451, 21 P. 2d 295; *In re Estate of Reed,* 157 Kan. 602, 142 P. 2d 824).

In *Reed* the following appears:

"A statute of limitation affects the remedy only, does not impair rights and

obligations, and the legislature has power to enact a statute placing a limitation as to time for the filing of an application for admission of a will to probate, even though a prior statute fixed a different limitation, so long as a reasonable time is given for the commencement of a proceeding for that purpose before the bar of the new statute takes effect." (Syl. ¶ 4.)

K. S. A. 60-503 was enacted into law February 27, 1963, to take effect January 1, 1964. Its terms provided a one year period for the commencement of existing causes of action prior to the application of the bar of the new statute of limitations. The time period allowed in 60-503 must be deemed reasonable (see *State, ex rel., v. Board of Education,* supra.)

Finally, appellants contend appellee Cities could not acquire prescriptive rights to the meter and regulator lease because of the terms of the lease. As indicated, the primary term was for ten years, subject thereafter to annual renewal upon payment of ten dollars per year. The lease contained the further proviso lessee could upon payment of one dollar cancel it at any time after the expiration of one year. Appellants say the terms of the lease are ambiguous and therefore the lease cannot be the basis for prescriptive rights. No cogent argument is presented to support the assertion and we find no merit in it. The lease was, at Cities' option, perpetual by its terms and purported to convey valuable rights in the nature of an easement. In the oft-cited case of *Insurance Co. v. Haskett,* 64 Kan. 93, 67 Pac. 446, this court stated:

"A prescriptive right to a private way is substantially the same in quality and characteristics and would arise in substantially the same manner as would title to land by adverse occupancy." (p. 96.)

We conclude the evidence adduced by appellees sufficiently brought into operation the limitations prescribed by K. S. A. 60-503 and the trial court did not err in entering judgment for them on the basis they had acquired prescriptive rights in the realty in question.

One further matter should be mentioned. The record on appeal consists of 242 pages, two-thirds of which was designated by appellees. Appellants sought advancement of costs, unsuccessfully, in the trial court as to this record on the ground of unnecessary designation by appellees and they renew the matter here. Our perusual of the the record indicates underdesignation by appellants and overdesignation by appellees. Our conclusion is the costs of the record should be apportioned equally between the parties and

it is so ordered (see *Johnston, Administratrix v. Ecord,* 196 Kan. 521, 412 P. 2d 990; Rules No. 3 and 6 [*e*], 205 Kan. xxvii, xxix).

The judgment is affirmed.

APPROVED BY THE COURT.

SCHROEDER, J., dissenting: The bombardment of this court with a 252-page record on appeal, most of which was designated by the appellees, and the confusion created by an attempt to summarize the evidence in the opinion, tend to obscure the simplicity of the facts and the issues presented. I cannot agree with the court's decision in several particulars.

*Title* to the one-half section of real estate in question passed *under the will of W. H. Armstrong,* duly admitted to probate in the probate court of Douglas County, Kansas. Final settlement under the will was made in March, 1919. The will devised a life estate to Leland O. Armstrong with a remainder in fee to his children, the appellants herein. The life estate of Leland O. Armstrong was subject to a prior life estate devised by W. H. Armstrong to Anna M. Armstrong, the testator's wife and the grandmother of Leland O. Armstrong. Anna died in April, 1919, thereby terminating her interest in the real estate.

The instruments by which the appellees acquired their easements for right-of-way purposes were executed by Leland O. Armstrong and his wife, who were in possession of the real estate when the instruments were executed.

The instruments by which these rights-of-way were granted to the appellees may be described as "quit-claim" in form. That is, they did not warrant the title of Leland O. Armstrong and his wife or undertake to defend the appellees should the grant be questioned in any way.

The claim of adverse possession herein asserted by the appellees is *against the remaindermen,* the appellants.

Long before the turn of the century the Kansas Supreme Court held that as against the *devisees of an estate in remainder* the possession of the estate by the life tenant, or by persons to whom the life estate has been conveyed, does not start any statute of limitations or prescription to running during the lifetime of the devisee of the life estate. (*Peck v. Ayres,* 79 Kan. 457, 100 Pac. 283; and *Dewey v. McLain,* 7 Kan. 126.)

The court relies on *Clark v. Butler Rural Electrification Ass'n,* 177 Kan. 344, 279 P. 2d 240, for the proposition that the two-year

statute of limitations, concerning the erection of electric transmission or distribution lines on property by a cooperative in Kansas, commenced to run against a remainderman while the life tenant was still in possession. There the life tenant owned the fee simple title when she executed a perpetual easement. She later conveyed to her son reserving a life estate. Furthermore, the court was there impressed with the specific statute in favor of cooperatives barring actions against them "after the expiration of a period of two years of continuous maintenance of such lines." The life tenant contended the statute (G. S. 1949, 17-4627) should be construed as beginning to run against him only at the time his estate became possessory, but the court said:

". . . We are cited to and know of no authorities warranting the sustaining of his position under our statute and the confronting facts and circumstances." (p. 346.)

In *Clark* the court was not confronted with the adverse possession statute, and the authorities heretofore cited on adverse possession (*Peck v. Ayres,* supra, and *Dewey v. McLain,* supra) were cited to the court in the briefs filed in the *Clark* case but were rejected as being immaterial to the decision. These cases on adverse possession have never been overruled. They are the law of Kansas today.

On the facts in this case Leland O. Armstrong, the life tenant, and the appellees are in *privity.* In other words, the appellees can assert no right to the ownership of their rights-of-way *based on the adverse possession statute* (K. S. A. 60-503) under a "belief of ownership" as long as the life estate of Leland O. Armstrong in the real estate continues to exist.

In this connection it was said in *Dewey v. McLain,* supra:

". . . Entering into possession then as the claimant of a life estate, his possession was not adverse to, but consistent with and in subordination to the rights of the reversioner. Will such a possession set a statute of limitations to running? Ordinarily not. In the case of *Kirk v. Smith,* 9 Wheaton 241, Marshall, C. J., says one of the rules applicable to limitation laws 'which has been recognized in the courts of England, and in all others where the rules established in those courts have been adopted, is, that possession, to give title, must be adversary—the word, indeed, is not to be found in the statutes, but the plainest dictates of common justice require that it should be employed.' 'It would shock that sense of right which must be felt equally by legislators and judges, if a possession which was permissive, and entirely consistent with the title of another, should silently bar that title. Several cases have been decided in this court in which the principle seems to have been considered as generally acknowledged, and in the State of Pennsylvania particularly it has been expressly recognized. *To allow a different construction would be to make a*

*statute of limitations a statute for the encouragement of fraud—a statute to enable one man to steal the title of another by professing to hold under it. No laws admit of such a construction.'"* (pp. 131, 132.) (Emphasis added.)

Where a life tenant or his assigns are in possession of the real property, there is no presumption that the holding by the assigns of a life tenant was under a claim adverse to the remaindermen during the existence of the life estate. (*Thompson v. Pacific Electric Ry. Co.,* 203 Cal. 578, 265 Pac. 220.) The presumption is that they intend to hold only during the life estate, unless some actual notice is brought forth to the remaindermen that a greater estate is claimed adversely. (See *Hays v. Lemoine,* 156 Ala. 465, 47 So. 97; *Mills v. Pennington,* 213 Ark. 43, 209 S. W. 2d 281; and *Cessna v. Carroll,* 178 Kan. 650, 290 P. 2d 803.) To hold to the contrary would be to impute bad faith to the assigns of the life tenant and knowledge thereof to the remaindermen. (*Thompson v. Pacific Electric Ry. Co.,* supra.) On the facts in the instant case the "quit-claim" grants to the appellees have no greater significance than a quit-claim deed to real property, which signifies that the grantee acquires no greater interest than the grantor had to convey or assign. The recording of the right-of-way grants by the appellees, which the court seems to emphasize, does not alter the situation. *Nowhere in the findings or conclusions made by the trial court is there any indication when the holding of the easement under the adverse possession statute by the appellees commenced to run against the remaindermen.*

On the facts here presented the remaindermen can not be held accountable for failing to bring an action authorized under K. S. A. 58-2523. There is no indication in the record that the grant of a right-of-way to each of the appellees herein, or the use of the right-of-way by them, constituted *waste* or that it was *a trespass causing injury to the remaindermen's interest in the real estate.* The appellants' claim in this action is founded upon the right to possession. (When the life tenant executed a five-year lease on the land in question to Ward Shull on November 30, 1961, for a golf course, the lease to commence March 1, 1962, with a provision for renewal, the appellants brought this action against the life tenant, the appellees and others within the fifteen-year period for possession of the land as remaindermen, on the ground that Leland O. Armstrong violated one of the conditions imposed upon his life estate.) The appellants are denied specific relief for possession of the real estate free of the easements and are relegated to compensation for dam-

ages against the appellees only by reason of the public convenience and necessity (the appellees having power of eminent domain). The appellants had no right of action, which depended upon the right of possession, until they were entitled to the possession of the real estate. This does not give the appellees the right to antedate the termination of the life estate with an assertion of trespass or waste. (*Thompson v. Pacific Electric Ry. Co.,* supra.) There being no evidence of trespass or waste to the remaindermen's interest, it must be assumed by the mere assertion, as it was by the court in relying upon K. S. A. 58-2523.

The opinion written for the court purports to arbitrarily ignore the foregoing law. The court seems to say, in effect, that the appellees were claiming adversely to the remaindermen under a "belief of ownership" long before the life estate terminated. If this is over-presumptuous in construing the court's opinion, it must be said the court is making a dual approach, the second being that the life estate of Leland O. Armstrong terminated more than 15 years prior to the appellants' action.

The second approach of the court is indicated by its approval of the shotgun finding made by the trial court as to when the adverse holding by the appellees began to run against the appellants. The detailed recital of the facts with emphasis on the forfeiture provisions in the will likewise embraces the veiled assumption that the life estate terminated more than 15 years prior to the filing of the appellants' action on the theory the life tenant violated conditions imposed upon his life estate. (This point was urged by the appellees in their brief as a ground for upholding the trial court.)

This point merits consideration for it is likewise erroneous, in my opinion. The provision in the will of W. H. Armstrong setting up the life estate in Leland O. Armstrong is quoted in the court's opinion and need not be repeated. The provision quoted indicates the life estate in Leland O. Armstrong *is subject to termination* upon the happening of certain conditions. The provisions here material read:

"If . . . Leland O. Armstrong, shall at any time, or in any way *make, execute or deliver any deed, mortgage, lease, equipment or any instrument in writing purporting or attempting to grant, convey, sell, mortgage or otherwise alienate said real estate,* except to lease or rent *the same* for a period of not more than three years at any one time, or if he should suffer or allow the taxes or assessment levied on said real estate to be in arrears more than two years, or if the said life estate in said real estate shall be sold to satisfy

the judgments of any court rendered against him, then and in such an event . . . *the life estate . . . shall cease, determine and be forfeited.* . . . " (Emphasis added.)

Language similar to that emphasized by the court in its opinion in a will granting a life estate with conditional limitations was described in *Conger v. Conger,* 208 Kan. 823, 494 P. 2d 1081 (not cited by the court). There the court distinguished between a condition subsequent and a conditional limitation. In the opinion the court said:

"The real distinction, however, between a condition subsequent and a conditional limitation is that in the former the estate is *voidable* upon the election of the person in whose favor the condition is imposed, while in the latter the estate is *void* upon the occurrence of the event that would terminate the estate. . . ." (p. 829.)

The distinction between the will in the *Conger* case and in the provisions of the will presently before the court is *the nature of the conditions imposed.* It must be emphasized that when W. H. Armstrong executed his will in 1915 there was a right-of-way for a gas pipeline across the half section of real estate in question, which he and his wife, Anna, had granted to the predecessors (assignors) of Cities Service Gas Company. In construing the material provision of the will here in question imposing the conditional limitation it is apparent W. H. Armstrong was restricting the limitation of the life estate to *a conveyance* of the one-half section of real estate by the life tenant *or an alienation otherwise accomplished.*

The term "alienation" has been defined as a voluntary and *complete transfer of the property and possession from one to another,* and any transfer of real estate, short of conveyance of title, is not an alienation of the estate. No matter in what form the sale may be, *unless title is conveyed to the purchaser,* the estate is not "alienated." (*Masters v. Madison County Mutual Insurance Co.,* 11 N. Y. 624; *Hiles v. Benton,* 111 Neb. 557, 196 N. W. 903; *Blank v. Browne,* 217 A. D. 624, 216 N. Y. S. 664; and *Nichols & Shepard Co. v. Dunnington,* 118 Okla. 231, 247 Pac. 353.)

The granting of a right-of-way to the appellees herein was not an alienation of the real estate herein within the meaning of the terms used in the will of W. H. Armstrong. Certainly, the granting of a right-of-way by the life tenant to the appellees, under threat of condemnation by the appellees (who had the power of eminent domain and, on the record presented, used against other landowners

in the vicinity to complete their acquisition of a right-of-way) could not be construed as an alienation of the real estate by the life tenant within the meaning of the provisions of the will.

The exception to the provisions regarding alienation in the will, authorizing the life tenant to *lease or rent the real estate* for a period of not more than three years at any one time, is likewise a condition that must be fulfilled to prevent the termination of the life estate in Leland O. Armstrong. The court's opinion suggests the granting of a meter and regulator lease in August, 1946, for the purpose of metering and regulating gas tapped from the gas pipeline installed pursuant to the right-of-way granted to Cities Service Gas Company, for a period of ten years with renewal privileges from year to year at a rental of $10 per year, was sufficient to arbitrarily hold that the life estate terminated in 1946 when the meter and regulator least was given. In my opinion this is utter nonsense. The will devised to Leland O. Armstrong *a half section of real estate for his life.* Surely, the granting of a lease for the installation of a meter and regulator on a few feet of ground within the confines of the half section to accommodate Cities Service Gas Company in its use of the gas pipeline installed on the right-of-way was not within the contemplation of the testator sufficient to cause a forefeiture of the life estate. The testator was speaking of a lease or rental of the entire half section, if not a substantial portion thereof, for a period of time longer than three years.

Forfeitures are not favored under the law, as they are considered harsh exactions, odious and to be avoided where possible. (37 C. J. S. Forfeitures, § 5, p. 10.) Forfeitures are not looked upon with favor by the courts, and one who seeks to enforce a forfeiture must himself be free from blame. (*Storm v. Barbara Oil Co.,* 177 Kan. 589, 282 P. 2d 417.) Under these circumstances Cities Service Gas Company is in no position to assert the meter and regulator lease to accomplish a forfeiture of the life estate, as it attempts to do in its brief.

At this juncture, it should be noted, the Cities Service Gas Company paid a $10 rental per year to Leland O. Armstrong for this meter and regulator lease from the time it was granted until this action was commenced. It seems to me this is an absolute *admission* binding upon Cities Service Gas Company in derogation of its asserted claim to a prescriptive easement based on a "belief of ownership" against the remaindermen. It recognizes Leland O.

Armstrong, with whom it is in *privity*, as the owner of the servient estate.

By classifying K. S. A. 60-503 as a statute of limitations the court justifies its application retroactively to a claim "under a belief of ownership," which is an entirely new concept under the adverse possession statute. In this respect amendment of the adverse possession statute, as it now appears in the new code of civil procedure, effective January 1, 1964, changes *the substantive rights* of the parties.

For example, prior to January 1, 1964, the appellees in this case were required to hold possession knowingly adverse and in open hostility to the owner of the property. They were required to hold the possession of the property in this manner for a period of fifteen years before their possession ripened into title. *By admission the appellees at no time claimed title to their easements knowingly adverse or in open hostility to the remaindermen in this case.* They candidly admit their claim to a prescriptive easement is based upon a "belief of ownership." Now, if "a belief of ownership" was insufficient prior to January 1, 1964, how can it be said the appellees have claimed adversely for a period of fifteen years under the present statute? (K. S. A. 60-503.)

To approach the question from another angle, it may be said on the date of each of the remaindermen's birth each acquired a vested interest as remainderman in the half section of real property in question. Thus, anything that affected his right to the property affected a vested right. As of December 31, 1963, the appellants' vested right was not affected in any way by adverse possession, on the facts in this case. If the statute is given retroactive application, the one-year period of limitation imposed by the legislature on actions commenced under 60-503, *supra*, would be sufficient to divest the remaindermen of their interest in the real estate on a "belief of ownership." In my opinion title cannot *ripen* by adverse possession founded upon a "belief of ownership" under 60-503 until January 1, 1979. To hold otherwise would violate the Constitution of the State of Kansas and the Constitution of the United States in that it would deprive the appellants of their property without due process of law and without just compensation. (*State, ex rel., v. Public Service Comm.*, 135 Kan. 491, 500, 11 P. 2d 999.)

The Kansas Supreme Court has held that a statute will not be given retroactive application unless the statute clearly indicates an intention on the part of the legislature to do so. (*State, ex rel., v.*

*Public Service Comm.*, supra.)˙ If the statute is given retroactive application and destroys or impairs vested property rights it is unconstitutional. (*Davis, Administrator v. Union Pacific Railway Co.*, 206 Kan. 40, 476 P. 2d 635; *Lyon v. Wilson*, 201 Kan. 768, 433 P. 2d 314; *Johnson v. Warren*, 192 Kan. 310, 387 P. 2d 213; and see *Eaton v. Doe*, 172 Kan. 643, 654, 243 P. 2d 236.)

Statutes of limitation are presumed to be prospective and not retrospective in their operation in the absence of clear legislative intent to the contrary, and the presumption is against an intent on the part of the legislature to make a statute retroactive. To give a statute retrospective operation the intention of the legislature that it shall so operate must be unequivocally expressed. (*Serrault v. Price*, 125 Kan. 548, 265 Pac. 63; *State v. Brown*, 146 Kan. 525, 73 P. 2d 19; and *Siefkin v. Siefkin*, 150 Kan. 396, 92 P. 2d 1005.)

But, 60-503, *supra*, is not a mere statute of limitations. It is more. This is apparent from the court's opinion when it cites substantial authority for the proposition that a modern adverse possession statute has a *twofold* purpose. First, to cut off the right to bring an action; and second, vest the disseisor with title. The court also cites authority for the proposition that the doctrine of adverse possession is a *ripening of certain types of possession into title by the lapse of time.*

Our court has held where an act is more than a mere statute of limitations it will have prospective application only. (*Serrault v. Price*, supra, and see *State v. Brown*, supra.) Where a statute operates retrospectively to effect divesting of vested property rights in real property it is unconstitutional and void. (*Davis, Administrator v. Union Pacific Railway Co.*, 206 Kan. 40, 476 P. 2d 635.)

In Gard, Kansas Code of Civil Procedure, Annotated, Sec. 60-503, the author sets forth the intention of the draftsmen of the new code provision in the "Advisory Committee Notes" as follows:

"It will be noted that this section changes the common law principles of adverse possession as pronounced by the Kansas Supreme Court. The purpose is to eliminate disputes, particularly, as to boundary lines which have been treated as correct over a long period of years."

The author's commentary is set forth in the court's opinion and indicates the change in the statute was designed for boundary line disputes. In these situations notice imparted by the recording Acts does not affect the parties, because resort to the record would not

show where the boundary between two tracts of land is actually situated with respect to the true boundary line.

While a syllabus prepared by the court would be helpful to inform the reader the basis of its holding, ostensibly, among other things, the court holds that under K. S. A. 60-503 any person who has been in open, exclusive and continuous possession of real property (or an easement of right-of-way, as here) under a good faith belief of ownership, which must be reasonable under all the facts and circumstances, for a period of fifteen (15) years acquires title by adverse possession. Furthermore, the rule is absolute in that *nothing whatever* on record regarding the real property is sufficient to impart constructive notice to the disseisor so long as he has no *actual* notice of infirmities in his grantor's title. (This case is complicated by the fact that the disseisors are corporations, discussed infra).

It seems to me the court's position on constructive notice imparted by the recording of title instruments amounts to this: These *public utilities* (appellees) with a competent legal staff at their disposal are not bound by the constructive notice which record title imparts, but the *minor remaindermen,* whose vested rights to the property were on record long before the granting of the easements, are bound by the notice which the subsequent recording of the easements imparts, even though the remaindermen were minors when the easements were granted and recorded. The remaindermen are held to be bound by constructive notice that each of the utilities was claiming a "perpetual easement." The remaindermen's stipulation that they knew the utility lines were on the real property is *not* tantamount to knowledge on their part that the utilities were claiming a perpetaual easement. They had a right to assume, absent actual knowledge to the contrary, that the utilities were holding their easements in privity with their grantor and consistent with his limited estate.

On the facts in this case the utilities should be held to constructive notice that Leland O. Armstrong had only a life estate. Conceding the law to be as stated in the court's opinion regarding constructive notice of defects in title where one claims by adverse possession, it has no application to the facts in this case. Here the utilities when they acquired their easements were dealing directly with *the person in possession* of the half section of land in which they were interested. This person was Leland O. Armstrong, the life tenant. One who acquires an interest in real property is bound to take

notice of the rights of the person in possession of the property. Now, the only instrument showing Leland O. Armstrong to have any rights in the real property whatever was the will of W. H. Armstrong, duly admitted to probate and on record in the probate court of Douglas County. Had the utilities exercised any diligence whatever, they would have found that the party in possession had only a life estate. *There was no defect in the chain of title.* The *limited* right of Leland O. Armstrong to the property was *in the very instrument by which he claimed title and possession.*

The remaindermen herein were *minors* throughout the entire period of time Leland O. Armstrong and the utilities were dealing with each other regarding the easements in question. Richard A. Armstrong was born December 5, 1926, and became of legal age and attained his rights of majority on *December 5, 1947;* and Betty J. Grisham was born December 7, 1931, and became of legal age and attained her rights of majority on *December 7, 1952.*

Commencing in 1929 and extending through August, 1946, the life tenant granted Cities Service Gas Company two pipeline right-of-way easements and a meter and regulator lease through the property in question. In 1944 the life tenant granted an easement to Kansas Electric Power Company (later merged into KP&L) for the construction of an electrical transmission line over the property.

The court charges these minor remaindermen with notice that the easements were "perpetual and in no way limited."

It seems to me the law which the court's opinion announces is topsy-turvy. K. S. A. 60-503, as construed by the court, encourages fraud. It is a statute which enables one man to steal the title of another by professing to hold under it. It confers privileged rules of law upon those least entitled to it.

The legislature had no intention whatever of abrogating the law of this state regarding constructive notice imparted by the recording of instruments affecting real estate titles when it enacted the new code of civil procedure, of which K. S. A. 60-503 is a part.

My concern with the court's decision is the impact it will have as a precedent, and the disrupting influence it will have on established institutions in our economic society which rely upon the stability of real estate titles by reason of the obligation the law imposes upon persons to take notice of matters on record concerning real estate.

Here we are dealing with "belief of ownership" which is a subjective consideration, a state of mind of the possessory claimant,

and not intent. For example, the utilities in this case to have a *good faith* "belief of ownership" had to be *diligent in their negligence*—their failure to examine the record and take notice of the instrument by which Leland O. Armstrong claimed possession and title. The trial court found the utilities had no *actual* notice of the limited estate.

Actually, on the facts in this case, the court's decision does not foster good faith. It encourages fraud. Of what culpable acts are the remaindermen guilty to justify the taking of their *vested* remainder?

The court in its opinion says there is evidence to support the trial court's findings. On the record presented the sufficiency of the findings may be questioned in one vital area—*good faith* in the belief of ownership by the utilities. The trial court simply found the utilities were in open, exclusive and continuous possession of the easements under a belief of ownership.

In their designation of additional portions of the record *both* Cities Service Gas Company and the Kansas Power and Light Company designated "Exhibit W—Release" to be incorporated in the record on appeal. This exhibit is a release for all crop and property damages arising from the construction of a "110 KV Line through my property . . ." [typed in blank space of form release], covering the real property here in litigation. The release recites that in consideration of the sum of "seventy-five dollars" [handwritten in blank space], the receipt of which is acknowledged, "I (we) *Anna M. Armstrong* [typed in blank space] L. O. Armstrong of Douglas County" [handwritten in blank space] (Emphasis added) unconditionally release "The L. E. Myers Co., and the Kansas Electric Power Co." [typed in blank space on form release]. The release was signed by L. O. Armstrong and dated the 21st day of July, 1944.

This release was unquestionably prepared by the Kansas Electric Power Company or its agents and presented for signature with the blank spaces completed with the typed information above indicated. Where did the Kansas Electric Power Company or its agents get the name: "Anna M. Armstrong"? The court says in its opinion the release contained "the typed name 'Anna M. Armstrong'—which fact remains unexplained in the record."

In July, 1944, Anna M. Armstrong had been dead over 25 years.

Under these circumstances there is only one source from which the name "Anna M. Armstrong" could have been acquired by the

utility dealing with the real property in question—from the will of W. H. Armstrong on *record* in the Probate Court of Douglas County. This very instrument disclosed that not only Anna M. Armstrong, but also Leland O. Armstrong, owned only a life estate in the real property in question.

Corporations of necessity must deal through persons who are their agents. They are charged with the acts and deeds of their agents, and also are charged with the knowledge which their agents possess. Under these circumstances "Exhibit W" places in the record a written admission by the Kansas Electric Power Company (later merged into KP&L) that it had knowledge of the instrument on record disclosing the limited estate of Leland O. Armstrong. *Good faith* under a belief of ownership? I think not. Under these facts and circumstances the Kansas Power and Light Company must be charged with knowledge of the true facts regarding the limited estate of Leland O. Armstrong with whom it was dealing, and it could not assert a belief of ownership in good faith. Otherwise, if the knowledge of its agents cannot be imputed to a corporate entity, no one could ever successfully challenge a corporation's claim of good faith under a belief of ownership.

The trial court did not find the utilities (appellees' herein) were in open, exclusive and continuous possession of the easements in question under a *good faith* belief of ownership. The trial court was content to adopt the utilities' positions that they relied upon employed agents to acquire the easements and do the work; and that none of the utilities' officers or attorneys were aware of the limited estate of Leland O. Armstrong as indicated by the many exhibits the utilities introduced showing their activities with the easements and financing of structures and transmission lines placed thereon.

These utilities may eventually find they have won the battle but lost the war, unless the legislature comes to their rescue. They are not on a one-way street in acquiring prescriptive rights by adverse possession under the new concept—belief of ownership.

An *analogous* situation is found in *Potter v. Northern Natural Gas Co.*, 201 Kan. 528, 441 P. 2d 802. There it was held the utility was not required to stand the expense of lowering its pipeline on the right-of-way acquired to accommodate the leveling and grading of farm land for irrigation purposes. As a result of the *Potter* decision utilities now find they are required to pay dearly for ease-

ments acquired through condemnation, where the juries are instructed in accordance with the law of the *Potter* case.

Under the new concept of adverse possession authorized by K. S. A. 60-503, as now construed by the court, utilities will be required to exercise the utmost diligence to avoid losing their easements to landowners who hold their land under a good faith belief of ownership free of the encumbrance of an easement. A pipeline, for example, buried for many years, where farming operations are conducted over the line, becomes lost to all except those who *actually* know of its existence or are charged with constructive notice by the recording of the easement. But under the new concept in adverse possession, "belief of ownership", constructive notice imparted by the recording of the easement is no longer a defense to adverse possession. That which is on record is immaterial where one in open, exclusive and continuous possession claims title under a good faith belief of ownership for fifteen years. Once the easement is lost the utility in all probability will be required to resort to its powers of eminent domain to acquire the easement. It will then be confronted with inflation, changed circumstances and such decisions as *Potter* and *Spears v. Kansas City Power & Light Co.*, 203 Kan. 520, 455 P. 2d 496, in a condemnation proceeding.

Any landowner, and there are many, can be just as *diligent in his negligence* to establish good faith under a "belief of ownership" as a utility.

It is respectfully submitted the judgment of the lower court should be reversed.

FATZER, C. J. and PRAGER, J., join in the foregoing dissenting opinion.