NOT DESIGNATED FOR PUBLICATION

No. 115,966

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN GODDARD and RONDA GODDARD,
*Appellees*,

v.

LEON F. PFEIFER and BEVERLY PFEIFER,
*Appellants*.

MEMORANDUM OPINION

Appeal from Graham District Court; PRESTON PRATT, judge. Opinion filed January 12, 2018. Reversed and remanded with directions.

*Tony A. Potter*, of Ward Law Offices, LLC, of Wichita, for appellants.

*Charles E. Worden*, of Worden Law Office, of Norton, for appellees.

Before PIERRON, P.J., ATCHESON, J., and WALKER, S.J.

PER CURIAM: John and Ronda Goddard filed a quiet title action in Graham County District Court to establish their right to nine acres of land through adverse possession. Leon F. and Beverly Pfeifer, the record owners of the property, resisted. After a one-day bench trial, the district court ruled for the Goddards. On the Pfeifers' appeal, we find the evidence insufficient to establish the Goddards and their predecessor in interest held the nine acres with the requisite belief in their ownership of the land—an essential element of their claim for adverse possession. We, therefore, reverse the

1

judgment and remand to the district court with directions to enter judgment in favor of the Pfeifers.

The disputed nine acres sits on the northern end of a southeast quarter section in rural Graham County. The Goddards own the northeast quarter section and reside there. They acquired the northeast quarter section in 2007 from Laurel Goddard, John's father. John, who was 52 years old at the time of the trial, was born and raised on the property. Laurel, in turn, received the northeast quarter section from his parents in 1966. John and Laurel have always understood they and their family also owned the disputed nine acres in the southeast quarter abutting the northeast quarter. In 2013, the Pfeifers bought the southeast quarter section, less 10 acres not at issue here, from Ron Cummings, who had owned that land for years.

When the Goddards brought their quiet title action in 2015, the Pfeifers were the undisputed record owners of the nine acres, as part of the southeast quarter they had purchased. The Goddards have not asserted any claim to record ownership of the disputed nine acres. The quiet title action provides the Goddards with a procedural vehicle to test the legal sufficiency of their claim of adverse possession as against the Pfeifers or anyone else with a potential interest in the land. See K.S.A. 60-1002(a). Before turning to the trial evidence bearing on the pivotal element of the Goddards' claim, we outline the pertinent principles of adverse possession.

The elements of adverse possession are set out in K.S.A. 60-503, which establishes the statute of limitations for bringing an action to recover real property: An action is barred against "any person . . . who has been in open, exclusive[,] and continuous possession of such real property, either under a claim knowingly adverse or under a belief of ownership, for a period of fifteen (15) years." Use of land by permission of the true owner cannot ripen into adverse possession ousting the owner. *Ruhland v. Elliott*, 302 Kan. 405, 412, 353 P.3d 1124 (2015). As the party relying on adverse

2

possession, the Goddards bear the burden of proving their entitlement to the nine acres. They must establish the requisite elements by clear and convincing evidence. 302 Kan. 405, Syl. ¶ 3. In turn, we filter our review through that standard and ask whether the evidence is such that a reasonable person could find the necessary facts proved to a high probability. *Ruhland*, 302 Kan. at 410-11 (citing *In re B.D.-Y.*, 286 Kan. 686, 694-96, 187 P.3d 594 [2008]); *In re B.D.-Y.*, 286 Kan. at 705 (appellate review examines whether fact-finder's conclusion reasonably considered "highly probable"). Determination of adverse possession is a question of fact. *Ruhland*, 302 Kan. at 409.

But, as those heightened evidentiary requirements indicate, adverse possession is disfavored in the sense that it may not be established "through inference" and "'[e]very presumption is in subordination to the rightful owner'" of the land. *Ruhland*, 302 Kan. at 410-11 (quoting *Boese v. Crane*, 182 Kan. 777, 782, 324 P.2d 188 [1958]). More broadly, the law is quite solicitous of the rights of landowners. For example, the statute of frauds requires that a sale of land or any real property interest be in writing. See K.S.A. 33-106; *Bouton v. Byers*, 50 Kan. App. 2d 35, 55-57, 321 P.3d 780 (2014) (discussing statute of frauds in context of importance the law attaches to real property as a unique and usually valuable commodity). The government maintains an elaborate recordkeeping system for land transactions, so the legal owner of a particular tract may be ascertained. See *Luthi v. Evans*, 223 Kan. 622, 629, 576 P.2d 1064 (1978). And landowners may bring tort actions against anyone falsely and maliciously impairing their title to their property. See *LaBarge v. City of Concordia*, 23 Kan. App. 2d 8, 16, 927 P.2d 487 (1996) (discussing actions for slander of title). In short, adverse possession is disfavored because it vitiates the ownership rights of the person holding legal title to real property.

As we have indicated, to establish adverse possession, the claimant must openly and exclusively hold the land continuously for 15 years. The claimant must do so either knowing he or she has no right to the land (that's acting "knowingly adverse" to the true owner) or under a belief of ownership (that's mistakenly thinking he or she is the actual

3

owner). John and Ronda Goddard held the nine acres from 2007 through the filing of their action in 2015—less than the required 15 years. But they may tack or rely on the time Laurel held the nine acres to satisfy the time element. *Stith v. Williams*, 227 Kan. 32, 36, 605 P.2d 86 (1980); *Taylor v. Missouri Central Type Foundry Co.*, 143 Kan. 175, 180-81, 53 P.2d 815 (1936). The durational requirement is not seriously disputed.

The Goddards do not claim they or Laurel occupied the nine acres knowing their possession to be adverse or hostile to the actual owners. Throughout the case, all of them have asserted a belief of ownership.

A claim of adverse possession based on a belief of ownership requires the belief to be both held in good faith and reasonable under the circumstances. See *Armstrong v. Cities Service Gas Co.*, 210 Kan. 298, 309, 502 P.2d 672 (1972); *Chesbro v. Board of Douglas County Comm'rs*, 39 Kan. App. 2d 954, Syl. ¶ 4, 186 P.3d 829 (2008) (adverse possession requires proof that "the belief of ownership was in good faith and reasonable under all of the facts and circumstances"). The belief, therefore, entails both subjective and objective components. A good-faith belief is one the claimant honestly or genuinely holds, invoking a subjective measure. See *Sowder v. Lawrence*, 129 Kan. 135, 138, 281 P. 921 (1929) ("[g]ood faith is like honest intent"). The reasonableness of the belief imposes an objective test and asks whether the axiomatic reasonable person would believe he or she owned the land under the circumstances. Cf. *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 39-40, 378 P.3d 1090 (2016) (good-faith trespasser must actually believe in superiority of his or her right to enter upon land, and there must be adequate support for the belief). Were the rule otherwise, the twin components of belief of ownership would be largely redundant, and the test as enunciated arguably could be either wholly subjective or wholly objective.[*]

[*]Neither an exclusively subjective test nor an exclusively objective test of ownership seems especially satisfactory. With a subjective test alone, a claimant theoretically could prevail based on an utterly bizarre notion—an undocumented land

4

grant from the French monarchy predating the Louisiana Purchase would suffice—so long as he or she was delusional enough to honestly believe it. A wholly objective test would allow claimants to go forward if they really didn't believe they owned the land, basically making it the same as a "knowingly adverse" claim.

The Pfeifers haven't questioned the sincerity or honesty of the beliefs John, Ronda, or Laurel hold as to their ownership of the nine acres. The Pfeifers, however, do challenge the objective reasonableness of the claimed ownership. And that stands as the only contested issue and, thus, the dispositive one.

At trial, John, Ronda, and other members of the Goddard family testified about their understanding of the use and ownership of the nine acres. As to ownership, they all relied on representations from Laurel that the family owned that land. The evidence also showed that Laurel genuinely believed in the family's ownership—years earlier, for example, he had hired a lawyer and threatened legal action against someone he perceived as trespassing on the nine acres.

As we understand the evidence, the parcel consists mostly of wooded land. About two acres had been cleared, and the Goddards occasionally grew alfalfa there. A single outbuilding sits on the nine acres; Laurel's wife had used it as a pheasant coop at one time. At trial, Laurel described the bulk of the tract as "just waste land," a description with which Cummings generally agreed. A creek meanders through the area. A fence separates the nine acres from the rest of the southeast quarter and, thus, joins the nine acres with the northeast quarter. The creek and fence figure in how Laurel came to understand the Goddard clan owned the nine acres. We now turn to that narrative.

Laurel was 88 years old when he testified during the trial and recounted circumstances that he plainly did not know firsthand. The precise sources of his information were never developed. According to Laurel, the fence line separating the nine acres from the rest of the southeast quarter dates to around the time of his birth.

5

Laurel explained that his father and Elmer Fox, his uncle who owned the southeast quarter section at the time, moved the fence because the creek kept flooding and repeatedly damaged the fence. Before the fence was moved, it matched the property line. Asked who used the nine acres after the fence was moved, Laurel testified: "It was just . . . my dad and I, and then Elmer Fox never claimed it. He just agreed with Dad to move that fence line on south to get around, to get past the creek." After a brief interjection from the Goddards' lawyer, Laurel added, "And that was considered our land from then on."

That's the substantive testimony from Laurel directly bearing on his belief about the ownership of the nine acres. Laurel was never asked who considered the nine acres to be his father's land. Nor did he testify that Fox told him the nine acres belonged to his father. Laurel didn't testify that his father said that he and Fox agreed that the nine acres went with the northeast quarter after they moved the fence.

Secondhand statements from Fox or Laurel's father would be hearsay and, at least for the most part, inadmissible to prove the truth of the matters asserted, i.e., the intended owners of the land. But any statements from them that moving the fence meant to signify the nine acres thereafter belonged with the northeast quarter section would be admissible to support Laurel's subjective and objective belief the Goddards owned the parcel. As it is, we have only Laurel's rather disembodied statement that the nine acres "was considered our land."

Nothing indicates Fox considered it so. The closest we have is Laurel's testimony that Fox never claimed the land. But if Fox still owned the nine acres, he presumably wouldn't feel the need to "claim" it. Nobody testified that Fox ever told any third parties that ownership of the land was transferred with the change in the fence line. That sort of admission arguably could be considered for its truth. See K.S.A. 2016 Supp. 60-460(j) (An out-of-court statement may be admitted as substantive evidence if it is "so far

6

contrary to the declarant's pecuniary or proprietary interest" that a reasonable person would not have made the statement unless he or she believed it to be true.). Cummings testified that he knew Laurel and other members of the Goddard family were using the nine acres but never discussed it with them. He said he didn't really care because the land wasn't particularly good for anything.

On cross-examination, Laurel was asked about the fence being moved and testified this way:

"Q. Okay. And at that point in time, Elmer Fox owned the property north of the fence, right?

"A. Yeah.

"Q. And he was okay with your dad using it?

"A. Well, yeah, south side of that.

"Q. It was by permission, is that right?

"A. Yeah, they set posts. They set three posts, and they're still there.

"Q. But it was by permission. Elmer Fox said, 'The creek is running. The fence won't stay in there. Let's put it down here and you can use the property north of the fence.' Right?

"A. Yeah."

Although this exchange is not a Rosetta stone to the puzzle of ownership, it certainly does not advance the Goddards' claim. The testimony seems, in our view, indefinite—lacking precision and foundation—in the same way as Laurel's assertion that the nine acres was simply "considered" the Goddards' land after the fence was moved from the property line. But the exchange does suggest a permissive use of the nine acres inconsistent with adverse possession.

On cross-examination, John Goddard was confronted with property tax statements for recent years showing the nine acres had been included with the southeast quarter

7

section. John Goddard agreed that meant he had not paid property taxes on the nine acres. He explained that he receives tax statements on 15 different parcels each year and had simply assumed the nine acres was included with the statement for the northeast quarter. We, likewise, do not see John Goddard's testimony as dispositive in and of itself. Laurel was not asked if he had paid property taxes on the nine acres. But a party asserting a belief in his or her ownership of land presumably would expect to pay the property taxes on the land. In short, the tax obligation and its payment would be a badge of a reasonable belief in ownership in an adverse possession action. See *Chesbro*, 39 Kan. App. 2d at 967-68 (recognizing tax payments as factor to be considered in weighing belief of ownership in adverse possession action but discounting failure to pay in that case given other strong evidence supporting belief). Conversely, claimants asserting adverse possession based on holding land hostilely to the true owners presumably would not be paying taxes on land they knew they didn't own.

John Goddard's failure to pay property taxes on the nine acres doesn't help his claim for adverse possession and specifically his reasonable belief that he and Ronda owned the nine acres. The evidence also fosters at least an inference the nine acres would not have been included in tax statements Laurel paid.

As we have explained, the critical issue here is the objectively reasonable basis for Laurel's belief that he owned the disputed nine acres, since his occupation of the land must be tacked with John and Ronda's occupation to meet the 15-year requirement for adverse possession. And our assessment of that evidence must be guided by the heightened standard of appellate review attaching to an adverse possession claim, since the elements must be proved by clear and convincing evidence. So we assess whether a fair-minded fact-finder could conclude to a high probability that Laurel had an objectively reasonable belief that he owned the nine acres.

Given the trial record, the evidence on that point does not cross the threshold to reach the highly probable. Laurel testified to a general and ultimately vague understanding that the nine-acre tract was "considered"—at least by somebody, although we aren't really sure who—property of the Goddard family. But there is little else to support that conclusion or belief. To be sure, nobody ever ordered Laurel or his parents off the nine acres. But that, too, is an ambiguous circumstance, especially given the lack of utility everyone attributes to the parcel. Cutting at least marginally against the reasonableness of Laurel's belief is his concession that Fox may have afforded the Goddard family some form of permissive use of the nine acres. The property taxes also inferentially count against the belief.

On balance, the Goddards' evidence trades on inference and speculation in this key respect. Their overall claim for adverse possession can be no stronger than the decidedly limited and diffuse evidence bearing on objective reasonableness of the belief in ownership. The record does not portray the kind of evidence that could fairly be characterized as clear and convincing on this specific point. As a result, the Goddards have not presented a viable claim for negating the Pfeifers' title to the nine acres and ousting the Pfeifers as the legally recognized owners of the land. Given the insufficiency of the Goddards' proof, the district court erred in entering judgment for them. Judgment should have been granted to the Pfeifers.

We, therefore, reverse the judgment for the Goddards and remand with directions that the district court enter judgment in favor of the Pfeifers and make such other orders as may be necessary to effectuate this decision.

9